1   Michael L. Tuchin (State Bar No. 150375)
    Robert J. Pfister (State Bar No. 241370)
2   Colleen M. Keating (State Bar No. 261213)
    KLEE, TUCHIN, BOGDANOFF & STERN LLP
3   1999 Avenue of the Stars, Thirty-Ninth Floor
    Los Angeles, California 90067
4   Telephone:    310-407-4000
    Facsimile:    310-407-9090
5   Email:        mtuchin@ktbslaw.com
                  rpfister@ktbslaw.com
6                 ckeating@ktbslaw.com

7   Steven T. Gubner (State Bar No. 156593)
    Larry W. Gabriel (State Bar No. 68329)
8   Michael W. Davis (State Bar No. 274126)
    EZRA BRUTZKUS GUBNER LLP
9   21650 Oxnard Street, Suite 500
    Woodland Hills, California 91367
10  Telephone:  818-827-9000
    Facsimile:  818-827-9099
11  Email:        sgubner@ebg-law.com
                  lgabriel@ebg-law.com
12                mdavis@ebg-law.com

13  *Attorneys for Plaintiff Alfred H. Siegel, as Trustee*
    *for the Circuit City Stores, Inc. Liquidating Trust*

14

15              **UNITED STATES DISTRICT COURT**

16            **NORTHERN DISTRICT OF CALIFORNIA**

17                **SAN FRANCISCO DIVISION**

18

19  IN RE OPTICAL DISK DRIVE ANTITRUST          Case No.
    LITIGATION
20                                              Master File No. 3:10-md-2143 RS
    _____
21  Alfred H. Siegel, as Trustee for the Circuit   **COMPLAINT FOR DAMAGES**
    City Stores, Inc. Liquidating Trust,
22                                              DEMAND FOR JURY TRIAL
                    Plaintiff,
23
           v.
24
    Sony Corporation; Sony Optiarc Inc.; Sony
25  NEC Optiarc Inc.; Sony Optiarc America Inc.;
    Sony Electronics Inc.; Toshiba Corporation;
26  Toshiba America Information Systems, Inc.;
    Samsung Electronics Co., Ltd.; Samsung
27  Electronics America, Inc.; Toshiba Samsung
    Storage Technology Corp.; Toshiba Samsung
28  Storage Technology Korea Corp.; Lite-On IT

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1   Corp.; Lite-On Sales & Distribution Inc.;
    Koninklijke Philips Electronics N.V.; Philips
2   Electronics North America Corporation;
    Philips & Lite-On Digital Solutions Corp.; and
3   Philips & Lite-On Digital Solutions USA, Inc.,

4            Defendants.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

Plaintiff Alfred H. Siegel, as the duly appointed trustee for the Circuit City Stores, Inc. Liquidating Trust (the "Circuit City Trust"), as and for his complaint against Defendants Sony Corporation; Sony Optiarc Inc.; Sony NEC Optiarc Inc.; Sony Optiarc America Inc.; Sony Electronics Inc.; Toshiba Corporation; Toshiba America Information Systems, Inc.; Samsung Electronics Co., Ltd.; Samsung Electronics America, Inc.; Toshiba Samsung Storage Technology Corp.; Toshiba Samsung Storage Technology Korea Corp.; Lite-On IT Corp.; Lite-On Sales & Distribution Inc.; Koninklijke Philips Electronics N.V.; Philips Electronics North America Corporation; Philips & Lite-On Digital Solutions Corp.; and Philips & Lite-On Digital Solutions USA, Inc., alleges as follows:

## I. INTRODUCTION

1.     Circuit City Trust brings this action to recover millions of dollars in damages that Circuit City Stores, Inc. and its affiliated companies ("Circuit City") suffered as a result of a price-fixing conspiracy by manufacturers of optical disk drives ("ODDs") that spanned approximately six years. Defendants and their co-conspirators – the leading manufacturers, sellers, and distributors of ODDs – colluded to fix, stabilize, and maintain the prices of ODDs from January 1, 2004 to at least January 1, 2010 (the "Conspiracy Period").

2.     Circuit City was a leading national retailer of consumer electronics and operated more than 700 electronics superstores in the United States. During the Conspiracy Period, Circuit City purchased billions of dollars' worth of ODDs and products containing ODDs both directly and indirectly from Defendants. As a result of Defendants' illegal actions, Circuit City was injured by paying substantially more for ODDs than it would have otherwise.

3.     Defendants and their co-conspirators carried out their price-fixing conspiracy through an integrated and sustained series of anticompetitive acts, including the following:

- Defendants rigged bids for ODD procurement events conducted by Original Equipment Manufacturers ("OEMs"), such as Dell Inc. ("Dell") and Hewlett-Packard Company ("HP");

- Defendants cooperated and agreed to set prices and/or allocate customers with respect to OEM and/or non-OEM sales; and

COMPLAINT

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

- Defendants and their co-conspirators exchanged confidential business information concerning ODDs, including but not limited to pricing and rebate information, production capacity, business plans and roadmaps for product rollouts and production, product quality information, inventory and shipping information, company responses to customer initiatives, and plans for the cessation of manufacturing of ODDs that had reached the ends of their lifecycles.

4.      During the Conspiracy Period, Defendants and their co-conspirators controlled the vast majority of the global market for ODDs, including the U.S. market.  Defendants' anticompetitive activities artificially inflated the prices of ODDs in the United States, including billions of dollars' worth of ODDs purchased by Circuit City, and thereby damaged Circuit City's business to the tune of tens of millions of dollars.

## II.  JURISDICTION AND VENUE

5.      This Court has jurisdiction over Circuit City Trust's claims pursuant to 28 U.S.C. §§ 1331, 1337, & 1367.

6.      This Court has personal jurisdiction over Defendants because each Defendant purposely availed itself of the laws of the United States by transacting business in the United States, manufacturing ODDs intended for sale to U.S. residents, and/or directly or indirectly marketing and selling ODDs to U.S. customers.  Each Defendant is also subject to the jurisdiction of this Court by virtue of its substantial aggregate nationwide contacts.  Further, Defendants' conspiracy was directed at and was intended to have and did have a direct, substantial, and reasonably foreseeable effect upon domestic and import trade or commerce in the United States.

7.      Venue is proper in this district pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b), (c), and (d) because each Defendant is an alien corporation, transacts business in this district, or is otherwise found within this district.  In addition, venue is proper in this district under 28 U.S.C. § 1391 because a substantial portion of the events giving rise to Circuit City Trust's claims occurred in this district, including many of Circuit City's purchases of ODDs.  Further, a substantial portion of the interstate trade and commerce affected by the conspiracy was carried out

COMPLAINT
MDL No. 10-2143

in this district. Defendants and their co-conspirators knew that price-fixed ODDs would be sold and shipped into this district.

### III. PARTIES

**A. Plaintiff**

8. On November 10, 2008, Circuit City Stores, Inc. and its affiliated companies filed petitions under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court"). On September 10, 2010, the Bankruptcy Court entered its Findings of Fact, Conclusions of Law and Order Confirming Modified Second Amended Joint Plan of Liquidation of Circuit City Stores, Inc. and its Affiliated Debtors (the "Plan Confirmation Order"), which, among other things, provided for the establishment of the Circuit City Stores, Inc. Liquidating Trust and the appointment of Alfred H. Siegel as trustee of the Circuit City Trust. Pursuant to the Plan Confirmation Order, on November 1, 2010, all assets of the Circuit City bankruptcy estates, including all causes of action, were vested in and transferred to the Circuit City Trust.

9. During the Conspiracy Period, Circuit City purchased large numbers of ODDs and ODD products manufactured by Defendants, their co-conspirators, and others. Many of Circuit City's purchases of ODDs and ODD products were made directly from Defendants, their subsidiaries, or their affiliated companies. Circuit City purchased, received, and took title to price-fixed ODDs at its distribution centers in several states, including California.

**B. Defendants**

10. Defendant Sony Corporation ("Sony Corp.") is a business entity organized under the laws of Japan, with its principal place of business located at 1-7-1, Konan, Minato-Ku, Tokyo 108-0075, Japan. Sony Corp. controls an integrated global enterprise comprising itself and other entities, including the other Sony Defendants described herein. During the Conspiracy Period, Sony Corp. manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

11. Defendant Sony NEC Optiarc Inc. ("Sony NEC") was a Japanese company with its headquarters located at 4-16-1 Okata, Atsugi-shi, Kanagawa 243-0021, Japan. Sony NEC was

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1   created on April 3, 2006 as a joint venture between Sony Corp. and NEC.  In 2008, Sony Corp.

2   purchased NEC's interest in Sony NEC and renamed it Sony Optiarc Inc.  During a portion of the

3   Conspiracy Period, Sony NEC manufactured, sold and/or distributed ODDs throughout the United

4   States and directly caused ODDs to be imported into the United States.

5        12.     Defendant Sony Optiarc Inc. is a Japanese company with its headquarters located at

6   4-16-1 Okata, Atsugi-shi, Kanagawa 243-0021, Japan.  During the Conspiracy Period, Sony

7   Optiarc Inc. manufactured, sold and/or distributed ODDs throughout the United States and directly

8   caused ODDs to be imported into the United States.  Sony Optiarc Inc. is now part of Sony

9   Corp.'s Consumer Products & Devices Group.

10       13.     Defendant Sony Optiarc America Inc. ("Sony America") is a wholly-owned and

11   controlled subsidiary of Sony Optiarc Inc.  Sony America is a Delaware corporation, with its

12   principal place of business located at 1730 N. First Street, San Jose, California 95112.  During a

13   portion of the Conspiracy Period, Sony America manufactured, sold and/or distributed ODDs

14   throughout the United States and imported ODDs into the United States.

15       14.     Defendant Sony Electronics Inc. ("SEI") is a Delaware corporation with its

16   principal place of business at 16530 Via Esprillo, San Diego, California 92127.  SEI is a wholly-

17   owned and controlled subsidiary of Sony Corporation of America, which, in turn, is a wholly-

18   owned and controlled subsidiary of Defendant Sony Corp.  During the Conspiracy Period, SEI

19   manufactured, sold and/or distributed ODDs throughout the United States and imported ODDs

20   into the United States.

21       15.     According to Sony Corp.'s SEC Form 20-F for the year ending March 31, 2011,

22   Sony Corp. is divided into business segments, including Consumer Products & Devices,

23   Networked Products & Services, and B2B and Disc Manufacturing.  The former two segments

24   contain ODDs.  The Form 20-F states that "[i]n most cases, sales of Sony's electronics products

25   are made to sales subsidiaries of Sony Corporation located in or responsible for sales in the

26   countries and territories where Sony's products and services are marketed.  These subsidiaries then

27   sell those products to unaffiliated local distributors and dealers or through direct sales via the

28   Internet.  In some regions, sales of certain products and services are made directly to local

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1   distributors by Sony Corporation."  As the Form 20-F further explains,  "Sony markets its

2   electronics products and services through Sony Electronics Inc. and other wholly owned

3   subsidiaries in the U.S."  The accounting report in the Form 20-F refers to Sony Corp. and its

4   consolidated subsidiaries collectively as "Sony."

5          16.     Defendants Sony America, Sony NEC, and Sony Optiarc Inc. are referred to

6   individually and collectively herein as "Sony Optiarc."  All of the entities referred to as Sony

7   Optiarc participated in the collusive conduct described herein, either directly or as represented by

8   other members of the Sony Optiarc group of Defendants.

9          17.     Defendants Sony Corp., SEI, Sony Optiarc America Inc., Sony NEC, and Sony

10  Optiarc Inc. are referred to individually and collectively herein as "Sony."  All of the entities

11  referred to as Sony participated in the collusive conduct described herein, either directly or as

12  represented by other members of the Sony group of Defendants.

13         18.     Defendant Koninklijke Philips Electronics N.V. ("Royal Philips") is a Dutch

14  company with its principal place of business at Groenewoudsweg 1, Einhoven 5261BA, the

15  Netherlands.  During the Conspiracy Period, Royal Philips controlled an integrated global

16  enterprise comprising itself and other entities, including Defendants Philips Electronics North

17  America Corporation, Philips & Lite-On Digital Solutions Corporation, and Philips & Lite-On

18  Digital Solutions USA, Inc.  Royal Philips manufactured, sold, and/or distributed ODDs

19  throughout the United States and directly caused ODDs to be imported into the United States.

20         19.     Defendant Philips Electronics North America Corporation ("Philips North

21  America") is a Delaware corporation with its principal place of business located at 3000

22  Minuteman Rd., Andover, Massachusetts 01810.  Philips North America is a wholly-owned

23  subsidiary of Royal Philips.  During the Conspiracy Period, Philips North America manufactured,

24  sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be

25  imported into the United States.

26         20.     Defendant Philips & Lite-On Digital Solutions Corporation is a business entity

27  organized under the laws of Taiwan, with its principal place of business located at 16F, 392, Ruey

28  Kuang Road, Neihu, Taipei, 114, Taiwan, R.O.C.  Philips & Lite-On Digital Solutions

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1  Corporation, established in March 2007, is a joint venture created by Philips & Lite-On.  Philips &

2  Lite-On Digital Solutions Corporation's operations include design, development, sales, marketing,

3  customer support, and service of ODDs.  During a portion of the Conspiracy Period, Philips &

4  Lite-On Digital Solutions Corporation manufactured, sold, and/or distributed ODDs throughout

5  the United States and directly caused ODDs to be imported into the United States.

6       21.    Defendant Philips & Lite-On Digital Solutions USA, Inc. is a business entity

7  organized under the laws of Delaware, with its principal place of business located at 42000 Christy

8  Street, Fremont, California 94538.  Philips & Lite-On Digital Solutions USA, Inc. is a subsidiary

9  company of Philips & Lite-On Digital Solutions Corporation and serves customers in the North

10  American and Latin American regions.  During a portion of the Conspiracy Period, Philips & Lite-

11  On Digital Solutions USA, Inc. manufactured, sold, and/or distributed ODDs to customers

12  throughout the United States and imported ODDs into the United States.

13       22.    Defendants Royal Philips, Philips North America, Philips & Lite-On Digital

14  Solutions Corporation, and Philips & Lite-On Digital Solutions USA, Inc. are referred to

15  individually and collectively herein as "PLDS."  All of the entities referred to as PLDS

16  participated in the collusive conduct described herein, either directly or as represented by other

17  members of the PLDS group of Defendants.

18       23.    Defendant Lite-On IT Corp. is a business entity organized under the laws of

19  Taiwan with its principal place of business located at 12F, 392, Ruey Kuang Road, Neihu, Taipei

20  114, Taiwan, R.O.C.  Lite-On IT Corp. controls an integrated global enterprise comprising itself

21  and other entities including Defendants Lite-On Sales & Distribution Inc., Philips & Lite-On

22  Digital Solutions Corporation, and Philips & Lite-On Digital Solutions USA, Inc.  During the

23  Conspiracy Period, Lite-On IT Corp. manufactured, sold, and/or distributed ODDs throughout the

24  United States and directly caused ODDs to be imported into the United States.

25       24.    Defendant Lite-On Sales & Distribution Inc. ("Lite-On Sales") is a Delaware

26  corporation with its principal place of business located at 42000 Christy Street, Fremont,

27  California 94538.   Lite-On Sales is a wholly-owned and controlled subsidiary of Lite-On IT Corp.

28

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1   During the Conspiracy Period, Lite-On Sales manufactured, sold, and/or distributed ODDs

2   throughout the United States and directly caused ODDs to be imported into the United States.

3       25.     Defendants Lite-On IT Corp. and Lite-On Sales are referred to individually and

4   collectively herein as "Lite-On."  All of the entities referred to as Lite-On participated in the

5   collusive conduct described herein, either directly or as represented by other members of the Lite-

6   On entities.

7       26.     Defendant Toshiba Corporation ("Toshiba Corp.") is a business entity organized

8   under the laws of Japan, with its principal place of business located at 1-1, Shibaura 1-chome,

9   Minato-ku, Tokyo 1058001, Japan.  Toshiba Corp. controls an integrated global enterprise

10  comprised of it and other entities, including Toshiba Samsung Storage Technology Corporation,

11  Toshiba Samsung Storage Technology Korea Corporation ("TSST Korea") and Toshiba America

12  Information Systems, Inc. ("TAIS").  During the Conspiracy Period, Toshiba Corp. manufactured,

13  sold and/or distributed ODDs throughout the United States and directly caused ODDs to be

14  imported into the United States.

15      27.     Toshiba Corp.'s 2009 Annual Report contained an organization chart that shows

16  Toshiba Corp.'s board and President and CEO exercising control and reporting authority over

17  multiple product segment subgroups, including the "Digital Products Group," which has

18  responsibility for storage devices and personal computers.  The Annual Report listed TSST, TAIS,

19  and Toshiba America Consumer Products, LLC ("TACP") as overseas "Consolidated

20  Subsidiaries."  Toshiba Corporation's 2009 Financial Review incorporated into its Annual Report

21  noted that the Toshiba Group comprised Toshiba Corp. and various "Consolidated Subsidiaries"

22  that operate in its multiple business segments.

23      28.     Defendant TAIS is a California corporation that has its headquarters at 9740 Irvine

24  Blvd, Irvine, California 92618.  TAIS is a wholly-owned and controlled subsidiary of Toshiba

25  America, Inc., which is in turn a wholly-owned and controlled subsidiary of Toshiba Corp.  During

26  the Conspiracy Period, TAIS manufactured, sold and/or distributed ODDs throughout the United

27  States and imported ODDs into the United States.  During the Conspiracy Period, TACP also

28

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1    manufactured, sold and/or distributed ODDs throughout the United States and imported ODDs into

2    the United States.  TACP was merged into TAIS on or about July 1, 2010.

3          29.      Defendants Toshiba Corp. and TAIS (which now includes the merged TACP) are

4    referred to individually and collectively herein as "Toshiba."  All of the entities referred to as

5    Toshiba participated in the collusive conduct described herein, either directly or as represented by

6    other members of the Toshiba entities.

7          30.      Defendant Toshiba Samsung Storage Technology Corporation is a business entity

8    organized under the laws of Japan with its principal place of business located at 1-1, Shibaura 1-

9    Chome, Minato-ku, Tokyo 105-8001, Japan (the same address as Toshiba's).  Toshiba Samsung

10    Storage Technology Corporation is a joint venture formed in 2004 and owned 51% by Toshiba and

11    49% by Samsung.  During the Conspiracy Period, Toshiba Samsung Storage Technology

12    Corporation manufactured, sold and/or distributed ODDs throughout the United States and directly

13    caused ODDs to be imported into the United States.

14          31.      Defendant TSST Korea is a business entity organized under the laws of South Korea

15    with its principal place of business located at 14th Floor, Building No. 102, Digital Empire 2, 486,

16    Sin-dong, Yeongtong-gu, Suwonsi, Gyonggi-do, Korea 443-734, which is part of the Samsung

17    Digital Complex.  In its 2009 Annual Report, Toshiba Corp. listed TSST Korea as an overseas

18    subsidiary.  During the Conspiracy Period, TSST Korea manufactured, sold and/or distributed

19    ODDs throughout the United States and directly caused ODDs to be imported into the United States.

20          32.      Defendants Toshiba Samsung Storage Technology Corporation and TSST Korea

21    are referred to individually and collectively herein as "TSST."  TSST has operated or currently

22    operates sales offices in North America and Logistics Centers in Miami, Florida and San Diego,

23    California.  All of the entities referred to as TSST participated in the collusive conduct described

24    herein, either directly or as represented by other members of the TSST entities.

25          33.      Defendant Samsung Electronics Co., Ltd. ("SECL") is a business entity organized

26    under the laws of South Korea, with its principal place of business at Samsung Main Building 250,

27    Taepyeongno 2-ga, Jung-gu, Seoul 100-742, Korea.  SECL controls an integrated global enterprise

28    comprised of it and other entities, including Toshiba Samsung Storage Technology Corp. and

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1    TSST Korea.  During the Conspiracy Period, SECL manufactured, sold and/or distributed ODDs

2    throughout the United States and directly caused ODDs to be imported into the United States.

3          34.      Defendant Samsung Electronics America, Inc. ("SEAI") is a subsidiary of SECL,

4    organized under the laws of New York, with its principal place of business located at 85

5    Challenger Rd., Ridgefield Park, New Jersey 07660.  During the Conspiracy Period, SEAI

6    manufactured, sold and/or distributed ODDs throughout the United States and imported ODDs

7    into the United States.

8          35.      SECL's 2008 Annual Report contained an organizational chart depicting the tight

9    control SECL exercises over its various business segments, with the "Digital Media &

10   Communications Business" reporting directly to SECL's CEO.  The independent auditor's report

11   incorporated in the Annual Report refers to SECL and its "controlled subsidiaries," including SEAI,

12   as "the Company."

13         36.      Defendants SECL and SEAI are referred to individually and collectively herein as

14   "Samsung."  All of the entities referred to as Samsung participated in the collusive conduct described

15   herein, either directly or as represented by other members of the Samsung entities.

16         37.      When referring to a corporate family or companies by a single name in this

17   Complaint, Circuit City Trust is alleging that one or more employees or agents of entities within

18   the corporate family engaged in conspiratorial acts on behalf of every company in that family.  In

19   fact, the individual participants in the conspiratorial acts did not always know the corporate

20   affiliation of their counterparts, nor did they distinguish among the entities within a corporate

21   family.  The individual participants entered into agreements on behalf of their respective corporate

22   families.  As a result, the entire corporate family was represented by their agents with respect to

23   such conduct and was party to the agreements reached by such agents.

24         38.      The conduct alleged herein was carried out by Defendants' and their co-

25   conspirators' officers, agents, employees, or representatives while engaged in the usual

26   management of their businesses.

27         39.      Each of Defendants named herein acted as the agent of, co-conspirator with, or

28   joint venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations

of law, and common course of conduct alleged herein.  Each Defendant or co-conspirator that is a subsidiary of a foreign parent acted as the United States agent for ODDs made by its parent company.  Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

**C.      Co-conspirators Not Named as Defendants**

40.      Various persons and/or entities not named as defendants in this Complaint participated as co-conspirators in the conspiracy alleged herein and performed acts and made statements in furtherance thereof.

41.      Co-conspirator Hitachi, Ltd. is a business entity organized under the laws of Japan with its principal executive office at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo 100-8280, Japan.  Hitachi, Ltd. controls an integrated global enterprise comprised of it and other entities including Hitachi America, Ltd. and Hitachi-LG Data Storage, Inc.  During the Conspiracy Period, Hitachi, Ltd. manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

42.      Co-conspirator Hitachi America, Ltd. ("Hitachi America") is a New York business entity with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.  Hitachi America is a wholly-owned subsidiary of Hitachi, Ltd.  During the Conspiracy Period, Hitachi America, Ltd. manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

43.      Co-conspirator Hitachi-LG Data Storage, Inc. ("HLDSI") is a business entity organized under the laws of Japan with its principal place of business located at 4F MSC Center Building, 22-23 Kaigan 3-Chome, Minato-Ku, Tokyo, Japan, 108-0022.  HLDSI is a joint venture, formed in November 2000, that is owned 51% by Hitachi, Ltd. and 49% by LG Electronics Inc. During the Conspiracy Period, HLDSI manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

44.      Co-conspirator Hitachi-LG Data Storage Korea, Inc. is a business entity organized under the laws of South Korea with its principal place of business located at LG Gasan Digital Center, 459-9 Gasan-dong, Geumcheon-gu, Seoul, 153-803 Korea.  Hitachi-LG Data Storage Korea,

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1   Inc. is part of a joint venture formed in January 2001 and is owned 51% by Hitachi, Ltd. and 49% by

2   LG Electronics Inc.  During the Conspiracy Period, Hitachi-LG Data Storage Korea, Inc.

3   manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs

4   to be imported into the United States.

5        45.     According to Hitachi, Ltd.'s SEC Form 20-F for the fiscal year ending March 31,

6   2010, HLDSI is a "subsidiary" of Hitachi, Ltd.  In its SEC Form 6-K dated November 16, 2009,

7   Hitachi, Ltd. disclosed that "a subsidiary" in Japan and "a subsidiary" in Korea were targets of

8   investigations by various countries' antitrust agencies with respect to antitrust violations relating

9   to ODDs and that these investigations might result in private actions being brought "against Hitachi"

10  and could have a "material adverse effect on Hitachi's business."  Hitachi, Ltd. reports financial data

11  for HLDSI in its consolidated annual financial results, where it indicates that its "Optical Disk Drive

12  operations" are conducted by HLDSI.

13       46.     Co-conspirators Hitachi, Ltd., Hitachi America, HLDSI, and Hitachi-LG Data

14  Storage Korea, Inc. are referred to individually and collectively herein as "HLDS."  All of the

15  entities referred to as HLDS participated in the collusive conduct described herein, either directly

16  or as represented by other members of the HLDS entities.

17       47.     Co-conspirator LG Electronics Inc. ("LG Electronics") is a business entity

18  organized under the laws of South Korea, with its principal place of business at LG Twin Tower

19  128, Yeoui-daero, Yeongdeungpo-gu, Seoul, Korea.  During the Conspiracy Period, LG Electronics

20  Inc. manufactured, sold and/or distributed ODDs throughout the United States and directly caused

21  ODDs to be imported into the United States.

22       48.     Co-conspirator LG Electronics U.S.A., Inc. ("LGUSA," and together with LG

23  Electronics, "LG") is a business entity organized under the laws of Delaware, with its principal

24  place of business at 1000 Sylvan Avenue, Englewood Cliffs, New Jersey 07632.  LGUSA is a

25  wholly-owned and controlled subsidiary of LG Electronics.  During the Conspiracy Period,

26  LGUSA manufactured, sold and/or distributed ODDs throughout the United States and directly

27  caused ODDs to be imported into the United States.

28

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

49.    Co-conspirator Panasonic Corporation ("Panasonic Corp.") is a Japanese entity with its principal place of business located at 1006, Oaza Kodoma, Kadoma-shi, Osaka 571-8501, Japan.  Until October 1, 2008, Panasonic Corp. was known as Matsushita Electric Industrial Co., Ltd. ("Matsushita").  During the Conspiracy Period, Panasonic Corp. manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

50.    Co-conspirator Panasonic Corporation of North America ("PCNA," and together with Panasonic Corp., "Panasonic"), formerly known as Matsushita Electric Corporation of America, is a Delaware corporation with its principal place of business at Two Riverfront Plaza, Newark, New Jersey 07102.  PCNA is a wholly-owned and controlled subsidiary of Panasonic Corp. During the Conspiracy Period, PCNA manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

51.    Co-conspirator TEAC Corporation ("TEAC Corp.") is a business entity organized under the laws of Japan, with its principal place of business at 1-47 Ochiai, Tama-shi, Tokyo 206-8530, Japan.  During the Conspiracy Period, TEAC Corp. manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

52.    Co-conspirator TEAC America, Inc. ("TEAC America," and together with TEAC Corp, "TEAC") is a California corporation with its principal place of business at 7733 Telegraph Rd., Montebello, California 90640.  TEAC America is a wholly-owned and controlled subsidiary of TEAC Corporation.  During the Conspiracy Period, TEAC America manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

53.    Co-conspirator Quanta Storage, Inc. ("Quanta Storage") is a business entity organized under the laws of Taiwan, with its principal place of business at 3F No. 188, Wenhua 2nd Rd., Guishan Shiang, Taoyuan County 333, Taiwan.  During the Conspiracy Period, Quanta Storage manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

54. Co-conspirator Quanta Storage America, Inc. ("Quanta America," and together with Quanta Storage, "Quanta") is a California corporation with its principal place of business in 2726 Bayview Dr., Fremont, CA 94538. Quanta America is a wholly-owned and controlled subsidiary of Quanta Storage, Inc. During the Conspiracy Period, Quanta America manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

55. Co-conspirator Sharp Corporation ("Sharp") is a business entity organized under the laws of Japan, with its principal place of business at 22-22 Nagaike-cho, Abeno-ku, Osaka 545-8522, Japan. During the Conspiracy Period, Sharp manufactured, sold, and/or distributed ODDs to customers throughout the United States and directly caused ODDs to be imported into the United States.

56. Co-conspirator NEC Corporation ("NEC") is a business entity organized under the laws of Japan with its principal place of business located at 7-1, Shiba 5-chome, Minato-ku, Tokyo 108-8001, Japan. During the Conspiracy Period, NEC manufactured, sold, and distributed ODDs to customers throughout the United States and directly caused ODDs to be imported into the United States.

57. Co-conspirator Pioneer Corporation ("Pioneer Corp.") is a business entity organized under the laws of Japan, with its principal place of business at 1-1 Shin-ogura, Saiwai-ku, Kawasaki-shi, Kanagawa 212-0031, Japan. During the Conspiracy Period, Pioneer Corp. manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

58. Co-conspirator Pioneer North America, Inc. ("Pioneer North America") is a Delaware corporation, with its principal place of business at 1925 E Dominguez Street, Long Beach, California 90810. Pioneer North America is a wholly-owned and controlled subsidiary of Pioneer Corp. During the Conspiracy Period, Pioneer North America designed, manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

59.     Co-conspirator Pioneer Electronics (USA) Inc. ("Pioneer USA") is a Delaware corporation, with its principal place of business at 1925 E Dominguez Street, Long Beach, California 90810. Pioneer USA is a wholly-owned and controlled subsidiary of Pioneer North America During the Conspiracy Period, Pioneer USA designed, manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

60.     Co-conspirator Pioneer High Fidelity Taiwan Co., Ltd. ("Pioneer Taiwan") is a Taiwanese company with its principal place of business at 13th Floor, No. 44, Chung Shan North Road, Sec. 2, Taipei, Taiwan, R.O.C. During the Conspiracy Period, Pioneer High Fidelity Taiwan Co., Ltd. designed and/or manufactured ODDs with the intent and agreement to distribute throughout the United States.

61.     Co-conspirator Pioneer Digital Design & Manufacturing Company ("PDDMC"),.a joint venture owned 66% by Pioneer Corp. and 34% by Sharp, is a business entity organized under the laws of Japan, with its principal place of business at 1-1 Shin-ogura, Saiwai-ku, Kawasaki-shi, Kanagawa 212-0031, Japan. During the Conspiracy Period, PDDMC manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

62.     Pioneer Corp., Pioneer North America, Pioneer USA, Pioneer Taiwan Co., and PDDMC are referred to individually and collectively herein as "Pioneer."

63.     Co-conspirator BenQ Corporation ("BenQ Corp."), now operating under the name QISDA Corporation, is a business entity organized under the laws of Taiwan, with its principal place of business at 16 Jehu Rd., Neihu, Taipei 114, Taiwan. BenQ Corp. controls an integrated global enterprise comprised of itself and other BenQ entities. In February 2003, BenQ Corp. formed a joint venture with Philips to manufacture and distribute ODDs that was called BenQ Philips Digital Storage ("PBDS"). In April 2006, Lite-On acquired BenQ Corp.'s ODD business and eventually replaced BenQ Corp. in PBDS, which was renamed PLDS. During the Conspiracy Period, BenQ Corp., separately or through PBDS, manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

14

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

64.     Defendant BenQ America Corporation ("BenQ America") is a California corporation with its principal place of business at 15375 Barranca, Suite A205, Irvine, California 92618.  BenQ America is a wholly-owned and controlled subsidiary of Defendant BenQ Corp.  During the Conspiracy Period, BenQ America manufactured, sold and/or distributed ODDs throughout the United States and imported ODDs into the United States.

65.     On information and belief, other business entities were co-conspirators with Defendants in their unlawful restraint of trade.  Circuit City Trust's investigation into the identities of co-conspirators is ongoing, and Circuit City Trust reserves the right to identify additional co-conspirators, including in its discovery responses and expert reports in this matter.

## IV.  FACTUAL ALLEGATIONS

**A.     Relevant Background**

66.     Optical disc drives, or ODDs, are devices that allow data to be read from and/or written to optical discs, such as compact discs ("CDs"), digital versatile discs ("DVDs"), and Blu-ray discs ("BDs").  ODDs can be internal drives, manufactured to be incorporated into devices including notebook and desktop computers, camcorders, and videogame consoles, or they can be external drives that connect to consumer electronics devices by means of an external interface, such as a Universal Serial Bus ("USB") connection.

67.     The ODD market has been one of the fastest growing markets in the electronics industry.  Broadly speaking, optical disc formats evolved from CDs, to DVDs, to Blu-ray discs.  Drives for each type of optical disc evolved from read-only technology (*i.e.*, drives that could read data recorded to the disc during the manufacturing process but lacked the capability to record data to the disc), to recordable, and then to rewritable (*i.e.*, allowing for multiple re-recordings).  During the Conspiracy Period, ODDs served as the principal means for recording, storing, and playing back music, movies, and other digital data and were a standard component on computers in the United States.  In large part due to the increasing popularity of personal computers, Defendants and their co-conspirators shipped hundreds of millions of ODDs each year, generating billions of dollars in annual revenues.

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

68.     Throughout its history, but especially after 2000, the ODD market, which requires significant technical resources and advanced manufacturing capabilities, has been dominated by a small group of manufacturers, as discussed in further detail below.  During the Conspiracy Period, Defendants and their co-conspirators controlled more than 90% of the ODD market.

69.     The ODD market has consistently faced downward pricing pressures, including as a result of technological advances in ODD technology.  As Defendants and their co-conspirators improved their ability to manufacture ODDs more efficiently and at a lower cost, the price of this technology began to decline.  However, Defendants and their co-conspirators colluded to fix prices, rig auctions for the supply of ODDs to OEMs, and allocate markets and customers in order to stabilize ODD prices and prevent them from dropping as quickly as they would have in a competitive market.

**B.     Structural Market Factors Favoring, and Acts Indicative Of, Collusion**

70.     During the Conspiracy Period, the ODD market exhibited several factors that contributed to the ability of Defendants and their co-conspirators to carry out their conspiracy, including but not limited to: (1) market concentration; (2) joint ventures and other collaborations; (3) significant barriers to entry (including patent pools); (4) common trade associations and business organizations; (5) the use of auctions for supply contracts, some of which included most favored nations clauses, whereby Defendants and their co-conspirators could and did collude; and (6) the standardization of ODDs.

**1.     Market Concentration**

71.     In 2005, the global market for ODDs was worth approximately $9.23 billion and approximately 303.8 million units were shipped.  According to some market estimates, the ODD industry currently generates yearly worldwide revenues in excess of $8 billion.

72.     Despite its large size, the ODD market is highly concentrated and dominated by a small group of suppliers.  This concentrated market was conducive to and facilitated the collusive conduct alleged herein.  According to published reports, the ODD industry was dominated by Defendants and their co-conspirators during the Conspiracy Period.

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

## 2.   Joint Ventures and Other Collaboration

73.   The ODD industry has experienced significant consolidation.  As manufacturing migrated toward lower-cost drive makers in Korea and Taiwan between 2001 and 2003, early Japanese manufacturers still held key competitive advantages in the form of intellectual property rights.  To mitigate the high cost of royalty payments for licensing this intellectual property, Taiwanese and Korean Defendants partnered with the patent holders through strategic alliances and joint ventures.  These alliances included:

- HLDSI, formed on November 1, 2000 in Tokyo, Japan;

- JVC Lite-On IT Manufacturing & Sales Ltd., a production and marketing company founded in October 2001 in Hong Kong;

- PBDS, founded in February 2003 and specializing in the manufacture of DVD+RW ODDs;

- The Sony & Lite-On "Alliance," a memorandum of understanding signed in May 2003 that led to acts of price-fixing of ODDs;

- TSST, established in April 2004;

- The Sony-NEC joint venture, formed in 2006, which was followed by NEC's transfer of its stock to Sony in September of 2008;

- Lite-On's acquisition of BenQ's ODD production facilities in 2006;

- Philips & Lite-On Digital Solutions Corporation, formed in March 2007; and

- PDDMC, the joint venture between Pioneer and Sharp that was announced in June 2009 and finalized in November 2009.

74.   The mutually beneficial nature of the business relations between and among certain Defendants and their co-conspirators provided the opportunity for their parent entities to conspire and created a financial incentive to do so.  As Gerald Cavanagh, a Sony spokesman in Tokyo, explained when announcing the formation of Sony NEC, the joint venture was formed because "[t]here was a feeling that those two complementary strengths [of Sony and NEC] would make more sense in a joint venture than competing against each other."

COMPLAINT
MDL No. 10-2143

Klee, Tuchin, Bogdanoff & Stern LLP
1999 Avenue of the Stars, Thirty-Ninth Floor
Los Angeles, California 90067
Telephone: 310-407-4000

75.     Similarly, after the formation of PLDS, the company's general manager, Tseng Huan-Xiong, stated that "[Royal] Philips and Lite-On in the future will target at making profits and avoid price wars."  According to a press report, Tseng stated that PLDS would maintain steady profits and a minimum gross margin by refusing low-priced orders and not participating in price-cutting competition.

76.     At various points during the Conspiracy Period, one defendant or co-conspirator produced ODDs for another defendant or co-conspirator.  For example, on information and belief, in November 2004, it was reported that Lite-On would produce more non-Blu-ray ODDs for Sony. As another example, in 2000, TEAC entered into an ODD co-development arrangement with Royal Philips.  As a third example, Quanta has manufactured ODDs for PLDS/PBDS and Sony Optiarc.

77.     The joint ventures and other collaborations among Defendants and their co-conspirators enabled them to force most of Taiwan's second-tier manufacturers and almost all Chinese manufacturers out of the ODD industry; the latter result was particularly anticompetitive because Chinese manufacturers had lower labor costs, a market reality that normally would enable a manufacturer to drive down prices on products such as ODDs.

**3.      Barriers to Entry**

78.     Throughout the Conspiracy Period, the ODD market was characterized by high manufacturing costs and technological barriers to entry.  Efficient manufacturing plants are large and costly, and ODD manufacturers incurred significant research and development expenses.

79.     Another barrier to entry was the difficulty in landing sizeable OEM orders.  OEMs usually required a lengthy qualification process before entering into supply agreements.

80.     ODD sellers' strong relationships with patent holders for component technology posed yet another barrier to entry, particularly in the PC market.  Establishing these important relationships with patent holders was difficult for low-volume manufacturers of ODDs, making it difficult for them to compete effectively in the market.  For example, PLDS noted the importance of access to patents on its website with respect to Blu-ray drives:

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1  PLDS is one of the few companies in the ODD industry that has access to an

2  extensive Blu-ray patent portfolio and a large Optical Disc Drive production

3  facility.  Combining these two aspects makes PLDS a leading company in the Blu-

4  ray Optical Disc Drive marketplace.  Other traditional ODD manufacturers will

5  need to pay Blu-ray royalties to the original patent holders or outsource their

6  production of BD drives to other manufacturers.

7      81.    Further, Defendants' and their co-conspirators' licensing structures imposed high

8  licensing costs that effectively deterred entry.  In the ODD industry, these structures have often

9  taken the form of patent pools whereby competitors pool their patents and grant a license with

10  sublicensing rights to a license administrator (typically a member of the pool) who issues licenses

11  to manufacturers of ODDs.  The licensees pay royalties to the administrator and the resulting

12  revenue is allocated among members of the pool, typically pursuant to a prearranged formula.

13      82.    For example, in 1998, Sony, Pioneer and Philips formed the 3C DVD Patent Group

14  to exploit jointly their various patents relating to the DVD format.  LG joined the group in July

15  2003, when John Koo, its Chairman and CEO, stated: "We will cooperate with those companies

16  on patent protection and patent exploitation now and in the future.  LG Electronics is excited to

17  join the most professional licensing organization in the field of optical storage patent licensing and

18  will consider future cooperation with the same partners in other optical storage programs in which

19  LG Electronics has important patent portfolios . . . ."  Pioneer joined the 3C DVD Patent Group as

20  well.  The licensing agreement imposed a DVD player license fee of 3.5% of the net selling price

21  for each player sold.  As of 2006, the 3C DVD Patent Group controlled the licensing of 115

22  patents relating to the manufacture of DVD players.

23      83.    In December 1998, core members of the DVD "+" camp formed a patent pool for

24  their essential DVD-ROM and video patents.  This consortium became known as the DVD3c

25  Patent Pool.  The DVD3c Patent Pool currently consists of Philips, Sony, Pioneer, Hitachi,

26  Matsushita (now Panasonic), Mitsubishi Electric Corp. ("Mitsubishi"), Thomson Multimedia,

27  Timer Warner, Toshiba, and Victor Company of Japan Ltd. ("Victor").

28

COMPLAINT
MDL No. 10-2143

84.     In June of 1999, members of the "-" camp formed a separate DVD-ROM and video patent pool, called the DVD 6C Patent Pool.  The original DVD6c was comprised of Toshiba, Hitachi, JVC, Time Warner, Matsushita, and Mitsubishi.  The DVD6c pool now consists of Hitachi, Mitsubishi, Panasonic, Samsung, Sanyo Electric Co., Ltd., Sharp, Toshiba, Victor, and Warner Brothers Home Entertainment Inc.

85.     Commencing in June 1999, leading developers of DVD technology and formats including Hitachi, Panasonic, and Toshiba commenced a worldwide joint licensing program for patents essential for DVD-Video players, DVD-ROM drives, DVD decoders and DVD-Video and DVD-ROM discs that conform to the specifications promulgated by the DVD 6C Patent Pool. Sharp and Samsung joined the DVD 6C Patent Pool in April 2005 and November 2006, respectively.  The DVD 6C Patent Pool royalties for licenses with respect to, *inter alia*, DVD-ROM drives and DVD decoders were initially set at 4% of the net selling price or $4 for these items.  As of 2006, the DVD 6C Patent Pool controlled the licensing of 377 patents.

86.     In March 2010, the BD4C Licensing Group, which includes Toshiba, announced that it had commenced a worldwide joint licensing program for patents needed for Blu-ray decoders, encoders, recorders, players, read-only discs, recordable discs, drives and BD/DVD hybrid discs.

87.     The royalties charged by DVD patent pools are enormous relative to the total cost of manufacturing ODDs.  Indeed, royalties account for the majority of the manufacturing cost for a potential entrant.  For example, the average worldwide price for a DVD burner (on an if-sold-OEM basis) was $30 in 2007, $25 in 2008, and $23 in 2009.  A working paper by Kenneth Flamm entitled "A Tale of Two Standards:  Patent Pools and Innovation in the Optical Disk Drive Industry" estimated the royalty payable to four principal patent pools holding IP related to a DVD recorder to be $17, or 68 percent of the average selling price of a DVD recorder in 2008 (and presumably an even larger share of its costs).  These costly patent pool royalties constituted a significant barrier to market entry by potential competitors.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

88.     Similarly, patent pools were established by Sony and Philips for CD technology; by Philips, Sony and Ricoh for CD-RW technology; and by Philips, Sony, and Taiyo-Yuden Co., Ltd. ("Taiyo-Yuden") for CD-R technology.

89.     The history of the patent pool for CD-R technology illustrates how patent pools can be used for anticompetitive collusion. To facilitate patent licensing to CD-R producers around the world, Philips, Sony and Taiyo-Yuden adopted a joint licensing arrangement whereby Sony and Taiyo-Yuden licensed their patent rights to Philips, which in turn bundled the rights together for licensing to other companies. In December 2008, the Taiwanese Fair Trade Commission ("TFTC") concluded that these companies had engaged in unlawful "concerted action" and improperly excluded competitors from the market and overcharged patent licensees. The TFTC imposed fines of NT$ 8 million on Philips, NT$ 4 million on Sony, and NT$ 2 million on Taiyo Yuden, and ordered the companies to immediately cease the illegal practices.

90.     Japanese companies adopted the strategy of charging high royalties to prevent Taiwanese and South Korean manufacturers with superior cost controls from quickly entering the DVD-ROM market. In response to high license royalties, Taiwanese and South Korean ODD makers sought to become part of the cartel and to tie up strategically with patent pool members (who enjoy cross-licensing privileges), procure drive kits, or sell product through such members. In exchange, members of the cartel controlled prices to prevent low-cost producers from cutting prices.

91.     Because of the barrier to entry posed by onerous patent royalties, efficient Taiwanese and Korean manufacturers that could not otherwise thrive in the ODD market formed joint ventures with less efficient manufacturers holding intellectual property rights. The ODD market increasingly coalesced around an oligopoly consisting of Sony NEC (later Sony Optiarc), HLDS, TSST, and PBDS (later PLDS). On information and belief, an analyst report in 2003 predicted that "the collective market share of this group will swell further to about 80%- 90% over the next two years." That is what happened during the Conspiracy Period, and the conspiracy controlled prices for ODDs.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

### 4. Trade Associations and Business Organizations

92.     Various industry trade organizations and events facilitated Defendants' and their co-conspirators' price fixing of ODDs.  Defendants participated in many of these meetings and events, which provided a forum for discussion and the exchange of information with respect to the pricing and production of ODDs and had the purpose and effect of fixing prices of ODDs.  In several instances, these trade association meetings preceded examples of collusive pricing conduct described herein.  ODD trade associations included the following:

### a. CD Trade Association

93.     CDs21 Solutions ("CDs21") is a trade association formed in April 2001.  Hitachi, HLDS, Sony, Panasonic, Lite- On, TSST and Philips Japan Co., Ltd. were among its members. Among the stated purposes of CDs21 were:

> To pursue ever more development of the industrial sector concerned by striving to closely unite the technology and the contents in the area of CD platform as well as by looking into future technologies.  . . . To promote the development of mutual businesses by fostering an environment where the knowledge and information can be shared by all as a common property.

### b. DVD Trade Associations

94.     The DVD Forum is a global group of hardware manufacturers, software firms and content providers formed in 1997 to promote and improve standards for the DVD format and products.  Hitachi, LG, Lite-On, NEC, Philips, Panasonic, Pioneer, Samsung, Sony, TEAC, Quanta, and Toshiba are all members of the DVD Forum.  The stated purpose of the DVD Forum is "to exchange and disseminate ideas and information about the DVD Format and its technical capabilities, improvements and innovations."

95.     Over the years, the DVD Forum has held various conferences and seminars in Taiwan, Japan, China, Europe, and the United States that allowed its members to exchange competitively sensitive information about ODDs.

96.     The DVD Forum has a Steering Committee that met regularly, including on June 9-10, September 22 and December 1, 2004; February 23, May 26, September 12, and November 16-

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1    17, 2005; February 22, May 24, September 12 and November 29, 2006; February 28, June 19,

2    September 12, and November 15, 2007; February 27, June 11, September 17, and November 19,

3    2008; February 25 and September 10, 2009; and February 24, 2010.

4       97.    Among those present at one or more of these meetings were: (a) Yutaka Komai,

5    Yukinori Kawauchi, and a Mr. Saito from Sony; (b) Young-Min Cheong, In-Sik Park, and Yong-

6    Chae Jeong from Samsung; (c) Kiyoung Lee, Kun Suk Kim, and Jea-Yong Joo from LG; (d)

7    Yasuo Ogasawara and Hiroshi Inada from NEC; (e) Hideki Mimura, Hiruharu Sato, Yoshihide

8    Fujii, and Messrs. Nishioka and Kaneda from Toshiba; (f) Yoshiho Gotoh, Yoshiharu Sakurada

9    and Messrs. Nakano, Murase and Kozuka from Panasonic; (g) Messrs. Imaide, Noguchi, and

10   Owashi from Hitachi; (h) a Ms. Ikei and a Mr. Heijnemans from Philips; (i) Junsaku Nakajima,

11   Akira Takahashi, Taiji Nishizawa, Masatoshi Tsujimoto, Hiroyuki Okada, and a Mr. Egawa from

12   Sharp; and (j) Matsumi Fujita, Shinichi Tsuji, and Messrs. Inoue and Yamada from Pioneer.

13      98.    These meetings took place in Japan, South Korea, Taiwan, the Netherlands, France,

14   Hawaii, and in many instances, California.  For example, the September 10, 2009 Steering

15   Committee meeting was held in Los Angeles, California and chaired by Defendant Toshiba.

16      99.    In April 2001, the Recordable DVD Council ("RDVDC") was formed.  Its 58

17   general members as of August 2001 were major Japanese and Korean companies in the ODD

18   supply chain.  The eight executive members of RDVDC included Hitachi, Ltd.; Hitachi Maxell

19   Ltd.; Matsushita (now Panasonic); SECL; and Toshiba Corp.

20      100.   Bon-Guk Koo, chairman of the RDVDC and Senior Corporate Advisor and former

21   Executive Vice-President of Samsung, stated that "[t]he Council will make its chief targets

22   industry outreach at major trade shows, information exchanges among Council members and

23   discussions aimed at expanding the recordable DVD market."  Mr. Koo noted that "[t]he

24   Recordable DVD Council has held six seminars in Japan, sponsored a joint Pavilion at the Fall

25   COMDEX in Las Vegas, and launched other promotional activities in 2001. . . . The Council's

26   membership has grown from 58 to 87 companies since the RDVDC was established a year ago,

27   making it the largest recordable DVD industry alliance among similar kinds of promotional

28   groups.  This is proof that our activities have been supported by the industry and we are proud of

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1   it."  In August of 2003, the RDVDC announced the establishment of the Compatibility Working

2   Group to ensure interoperability of products using RDVDC-supported recordable DVD formats.

3         101.    The RAM Promotion Group ("RAMPRG"), formed in 2003, includes (among

4   others) Hitachi, TEAC, HLDS, Panasonic, LG, Toshiba, and Samsung.  RAMPRG is ostensibly

5   committed to promoting the DVD-RAM format and popularizing DVD-RAM related products on

6   an international basis.  RAMPRG is supported by the RDVDC, and all of the founding members

7   of the RAMPRG are also members of the RDVDC.

8         102.    The DVD+RW Alliance ("Alliance") is a group of electronic hardware, optical

9   storage and software manufacturers who in 1997 created and promoted a format standard of

10   recordable and rewritable DVDs, known as the "plus" format.  As of 2004, plus format DVDs

11   were available in various forms, including DVD+R and DVD+RW.  Sony and Philips were

12   members of the Alliance, which has both a Product Promotions Group and a Compatibility &

13   Convergence Group.

14                    **c.    Blu-Ray Trade Associations**

15         103.    The Blu-ray Disc Association ("BDA") is a worldwide group inaugurated in 2005

16   to promote the BD format and products, with members including Hitachi, Pioneer, LG, NEC,

17   Philips, Samsung, Sony, TEAC, Quanta, and Toshiba.  Sony, LG, and Hitachi are founding board

18   members of the BDA.  The BDA was created and maintained by its members to, *inter alia*,

19   establish standardized formats and cross license technology.

20         104.    In April 2008, Stan Glasgow, the President of Sony Electronics, stated that in order

21   to ensure that the prices of ODDs that play BDs would not fall precipitously, the BDA would not

22   be soon licensing to any manufacturers in China.

23                    **d.    Multiformat Trade Associations**

24         105.    According to its website, the Optical Storage Technology Association ("OSTA"):

25   "was incorporated as an international trade association in 1992 to promote the use of recordable

26   optical technologies and products" and "includes optical product manufacturers and resellers from

27   three continents, representing more than 85 percent of worldwide writable optical product

28   shipments."

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

106.   During the Conspiracy Period, OSTA's membership included ODD manufacturers such as Sony, LG, Panasonic, Toshiba, Philips, Samsung, and Pioneer.  OSTA works to "shape the future of the industry" through regularly scheduled meetings covering a variety of industry topics and an annual Optical Storage Symposium described below.  Benefits of OSTA membership touted on its website include:

- Influenc[ing] the health and direction of the industry.

- Meet[ing] with industry peers for information exchange.

- Receiv[ing] early foresight into industry strategies.

107.   OSTA also plays an important role in the industry through its efforts to establish industry-wide specifications for optical disc and ODD technologies including MultiRead (as described below), MultiPlay, and Universal Disk Format.

108.   In 2005, OSTA meetings were held on February 28, March 1-2, June 13-15, September 12-14 and December 5-7 in San Francisco, California.  In 2006, OSTA meetings were held on March 2-3, June 12-14, October 5-6, and December 4-6 in San Francisco, with the exception of the October 5-6 meeting, which took place in Tokyo, Japan.  In 2007, OSTA meetings were held on March 5-7, June 11-13, September 17-19, and December 3-5 in San Francisco.  In 2008, OSTA meetings were held on March 17-19, June 16-18, October 6-8 and December 8-10 in San Francisco.  The last known general meeting of the OSTA took place on March 16-18, 2009 in Cupertino, California.

109.   Attendees at one or more of these various meetings included Christopher Smith of Sony Corporation; Paul Castellana of Toshiba; Maciek Brzeski of Toshiba; Yong Cheol Park of LG; Patrick Yen of Lite-On; Frank Simonis of Philips; and Young Yoon Kim of SECL.  Under the guise of an industry forum, these representatives had opportunities to meet and communicate regarding the price-fixing conspiracy for ODDs.

110.   The International Symposium of Optical Memory ("ISOM") is an organization created in Japan that is concerned with the technology of optical memory and provides an annual forum at which its members can share information.  Its members include Sony, Sharp, Pioneer, Panasonic, Toshiba, Hitachi, LG, NEC and Samsung.  The 2004 meeting took place on October

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1   11-15 at Jeju Island, South Korea; the 2005 meeting took place on July 10-14 in Honolulu,

2   Hawaii; the 2006 meeting took place on October 15-19 in Kagawa, Japan; the 2007 meeting took

3   place on October 21-25 in Singapore; the 2008 meeting took place on July 13-17 in Waikoloa,

4   Hawaii; the 2009 meeting took place on October 4-8 in Nagasaki, Japan; and the 2010 meeting

5   occurred on October 24-28 in Hualien, Taiwan.

6       111.    Attendees at these various meetings included: (a) T. Maeda, H. Miyamoto, M.

7   Nakamura, M. Ojima, Hiroyuki Minemura, and T. Shintani of Hitachi; (b) Jin-Yong Kim, Yun-

8   Sup Shin, and In-Ho Choi of LG; (c) Ryuchi Katayama, H. Inada, T. Iwanaga, Y. Yamanaka, and

9   H. Fukuchi of NEC; (d) J.A.M.M. van Haaren of Philips; (e) Isao Ichimura, Atsushi Fukumoto,

10  Kimihiro Saito, Masataka Shinoda, M. Takeda, K. Nishitani, M. Toishi, S. Kubota, and S.

11  Higashino of Sony; (f) Yutaka Kahihara, Y. Honguh, H. Yamada, Hiromichi Kobori, and A. Hirao

12  of Toshiba; and (g) Chong Sam Cheung, Dong-Ho Shin, Kyung-Guen Lee, Jooho Kim, and I.-S.

13  Park of Samsung.

14      112.    The RW Products Promotion Initiative ("RWPPI") is a trade association formed in

15  Tokyo, Japan in May 2000 to promote rewritable optical discs. The founding members included

16  Hitachi Maxell Ltd., LG, Pioneer, Sharp, Sony, and Samsung; Lite-On, NEC, TSST and Sony

17  Optiarc subsequently joined the association. RWPPI's main stated activities included the

18  exchange of various types of commercial and technical information. In January 2001, RWPPI

19  created a United States Liaison Office located at the Long Beach, California office of Pioneer

20  North America to "facilitate the exchange of information among RWPPI members in North

21  America."

22      113.    The RWPPI held numerous meetings at the Japanese locations of Sharp and

23  Pioneer during the Conspiracy Period, which provided a forum for Defendants and their co-

24  conspirators to communicate and agree upon prices for ODDs. The dates and locales of those

25  meetings are set forth in the following chart.

26

27

28

| Date of Meeting | Meeting Location |
|---|---|
| 3/13/2009 | Pioneer (Meguro, Tokyo, Japan) |
| 12/5/2008 | Sharp (Makuhari, Chiba, Japan) |
| 9/19/2008 | location unknown |
| 6/18/2008 | Pioneer (Meguro, Tokyo, Japan) |
| 2/14/2008 | Pioneer (Meguro, Tokyo, Japan) |
| 12/7/2007 | Sharp (Makuhari, Chiba, Japan) |
| 9/13/2007 | location unknown |
| 6/12/2007 | Pioneer (Meguro, Tokyo, Japan) |
| 4/18/2007 | Pioneer (Meguro, Tokyo, Japan) |
| 2/14/2007 | Pioneer (Meguro, Tokyo, Japan) |
| 12/6/2006 | Sharp (Makuhari, Chiba, Japan) |
| 10/20/2006 | Pioneer (Meguro, Tokyo, Japan) |
| 8/23/2006 | Pioneer (Meguro, Tokyo, Japan) |
| 6/21/2006 | Pioneer (Meguro, Tokyo, Japan) |
| 4/28/2006 | location unknown |
| 2/17/2006 | Pioneer (Meguro, Tokyo, Japan) |
| 12/7/2005 | Sharp (Makuhari, Chiba, Japan) |
| 10/28/2005 | Pioneer (Meguro, Tokyo, Japan) |
| 8/3/2005 | Pioneer (Meguro, Tokyo, Japan) |
| 6/16/2005 | location unknown |
| 4/15/2005 | Pioneer (Meguro, Tokyo, Japan) |
| 2/17/2005 | location unknown |
| 12/9/2004 | Sharp (Makuhari, Chiba, Japan) |
| 10/29/2004 | Pioneer (Meguro, Tokyo, Japan) |
| 8/26/2004 | Pioneer (Meguro, Tokyo, Japan) |
| 6/15/2004 | Pioneer (Meguro, Tokyo, Japan) |
| 4/14/2004 | Pioneer (Meguro, Tokyo, Japan) |
| 2/25/2004 | Pioneer (Meguro, Tokyo, Japan) |

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

COMPLAINT
MDL No. 10-2143

114. The RWPPI appears to have disbanded, and closed its website in March of 2009, shortly before a federal grand jury began issuing subpoenas as part of an antitrust investigation into the ODD industry.

      **e.**      **Trade Shows**

115. The International Consumer Electronics Show ("CES"), the world's largest consumer electronics show, was held annually during the Conspiracy Period, providing members of the conspiracy the opportunity to communicate with each other about the conspiracy. The 2010 CES took place from January 7-10, 2010 in Las Vegas, Nevada.

116. As noted above, the Optical Storage Symposium is a worldwide conference held annually from 2001-2007 at various locations sponsored by OSTA. The 2007 event was held in South San Francisco on September 18-19, 2007. The 2006 event, held in Tokyo, Japan on October 5, 2006, included presenters from Sony, Hitachi and CDs21. The 2004 event held in Burlingame, California on September 25, 2005 and co-sponsored by, among others, Sony and Toshiba, included presenters from Sony and Toshiba.

117. The Internationale Funkausstellung ("IFA") is a worldwide exhibition of consumer electronics products that is held annually in Berlin, Germany and attended by representatives of Defendants. Recent IFA shows occurred on September 3-8, 2010; September 4-9, 2009; August 29-September 3, 2008; August 31-September 5, 2007; September 1-6, 2006; and September 2-7, 2005.

118. The conduct of the "business" of these trade shows or events gave Defendants and their co-conspirators the cover needed to share competitively sensitive information and to reach and implement anticompetitive agreements.

      **5.**      **Standardization of ODDs**

119. A product is considered standard when there is a high degree of substitutability across suppliers in the market. When products are viewed as interchangeable by purchasers, it is easier to agree for manufacturers and sellers to agree upon a single price for the product in question and to effectively monitor prices, thereby facilitating the establishment and maintenance of a conspiracy.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

120.   The ODD industry has been typified by standardization of ODDs driven by industry participants and a variety of industry-related organizations such as ECMA International, the International Standardization Organization ("ISO"), and the International Electrotechnical Commission, which are dedicated to standardizing the use of consumer electronics.

121.   For example, OSTA developed "MultiRead," an industry consensus aimed at defining the parameters and specifications necessary for all classes of optical discs to be read on current and future ODDs.  On March 7, 2000, OSTA announced that 17 ODD manufacturers, representing well over 90 percent of the ODD market at the time, achieved compliance with its MultiRead specification.  Those 17 manufacturers included Hitachi, LG, Lite-On, Philips, Samsung, Sony, and Toshiba.

122.   Patents and intellectual property rights were also used to require adoption of standardized ODD product specifications.

123.   Two competing camps of companies formed within the new standardization effort, one led by Sony and Philips, the original developers of the CD standard, and the other by Matsushita (now Panasonic), Toshiba, and Time Warner.  Under pressure from potential users in both the computer industry and the entertainment industry, a DVD Forum was established to unify the competing technological standards.

124.   All parties agreed to a single standard for next-generation DVD video disks, and read- only data storage, but no agreement on writeable DVD data storage was reached.  Sony and Philips became the nucleus of a DVD "+" camp, while Pioneer, Hitachi, Matsushita (Panasonic), Toshiba, Mitsubishi, JVC and Time Warner formed a DVD "-" camp.  The result was two sets of incompatible write formats for DVDs, ultimately unified only by more complex products, "super multi" DVD drives capable of reading or writing all the incompatible formats.

125.   The standardization of the ODD industry provided Defendants and their co-conspirators with a mechanism to implement, enforce, and oversee their agreements to stabilize the prices of ODDs.  ODDs are commodity products, and consumers' decisions to purchase such products are typically based largely, if not exclusively, on price (rather than brand name).

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

**C.      Defendants' Sales of ODDs and Market Control**

126.    During the Conspiracy Period, each Defendant and co-conspirator, or one or more of its subsidiaries and/or affiliated joint ventures, sold ODDs in the United States in a continuous and uninterrupted flow of interstate and foreign commerce, including through and into this district. The business activities of Defendants and their co-conspirators substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

127.    During the Conspiracy Period, Defendants and their co-conspirators collectively imported at least tens of millions of ODDs into the United States. Defendants and their co-conspirators collectively controlled a majority of the market for ODDs globally, nationwide, and within this district.

128.    For example, Sony Optiarc had sales of $1.52 billion for the year ending in March 2008, the last year for which Sony disclosed the unit's annual revenue. HLDS had revenue of $2.4 billion in 2005, the last year for which figures are available. TSST forecast revenue of 250 billion yen in fiscal year 2004, when it was established.

129.    Throughout the Conspiracy Period, Defendants and their co-conspirators sold ODDs through various channels, including to manufacturers of electronic devices and to resellers of ODDs such as Circuit City Trust. Some Defendants also sold ODDs directly to end users through online or brick-and-mortar stores.

130.    California is the worldwide center of the personal computer industry and other industries that depend upon the ODD market. Statements concerning the prices and market conditions for ODDs were disseminated by Defendants and their co-conspirators from and into California on a continuous basis.

**D.      Acts of Collusion with Respect to ODDs**

131.    Defendants and their co-conspirators reached understandings and agreements to stabilize the prices for ODDs in numerous ways throughout the Conspiracy Period.

132.    Defendants and their co-conspirators participated in meetings, discussions, and communications in the United States or elsewhere to discuss bidding strategies and prices of ODDs. During those meetings, discussions, and communications, Defendants and their co-

COMPLAINT
MDL No. 10-2143

1    conspirators reached agreements and understandings regarding prices to charge customers for

2    ODDs and how participants would bid on ODDs, including prices and bids to Circuit City.

3    Defendants and their co-conspirators submitted bids and prices in accordance with the agreements

4    reached during those meetings, discussions, and communications.

5    133.    One manifestation of the conspiracy involved regular exchanges of information

6    among Defendants and their co-conspirators of confidential business information concerning

7    ODDs, including prices charged and to be charged, production capacity, business plans,

8    confidential roadmaps for product rollouts and production, product quality information, inventory

9    and shipping information, company responses to customer initiatives, and plans for the cessation

10    of manufacture of ODDs that had reached the ends of their respective lifecycles. All of these

11    information exchanges were undertaken for the purpose of fixing the prices of, and allocating

12    customers with respect to, ODDs.

13    134.    Another of the many manifestations of Defendants' conspiracy involved bid-

14    rigging. Several OEMs in the United States, including but not limited to Dell and HP, conducted

15    auctions among suppliers of ODDs during the Conspiracy Period. Dell's auctions began as early

16    as 2002 and were conducted from its headquarters in Austin, Texas during most of the Conspiracy

17    Period. HP's auctions began in 2004 and were conducted from either Palo Alto, California or

18    Houston, Texas during most of the Conspiracy Period.

19    135.    These auctions can be classified into two general types: e-auctions and eRFQs

20    (Electronic Requests for Qualifications). E-auctions were typically live, real-time events that

21    spanned a few hours in which each competing supplier could submit multiple bids. ERFQs

22    typically spanned more than one day and involved multiple rounds of bidding. The OEM would

23    provide feedback to competing ODD suppliers during the process. ODD auctions typically

24    occurred on a quarterly basis or, at most, six times a year.

25    136.    These auctions were not typically "winner takes all" situations. Many OEMs filled

26    their needs by awarding contracts to multiple vendors. Typically, three to four (and sometimes

27    five) bids were selected on a tiered basis. Allocation was based on rank by "Total Available

28    Market" ("TAM"). To use hypothetical examples, if the TAM was close between two suppliers,

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

31

1   an OEM might allocate 35% of the auctioned business to the first tier supplier and another 35% to

2   the second tier.  If the TAMs were more dispersed, suppliers in the tiers below the first tier would

3   be allocated successively lesser shares of the auctioned business.

4       137.   Among others, PLDS, HLDS, Sony Optiarc, TSST, Quanta, Lite-On, and TEAC

5   participated in auctions run by, *inter alia*, Dell and HP.  The auctions encompassed various types

6   of CD, DVD and Blu-ray drives for internal use within computers, as well as some external ODD

7   players.  In dozens of those auctions, Defendants rigged their bids by: (a) agreeing to fix the prices

8   at which they bid; (b) agreeing to allocate their respective positions in tiers of successful bidders;

9   and (c) exchanging competitively sensitive information on price, desired tier positions, prior bids

10  and bidding outcomes, quality assessments by OEMs (which could affect whether an OEM would

11  allow a supplier to bid for a top tier position on a particular auction), and the timing of the

12  introduction of new products or the cessation of ones that had reached the end of their lifecycles.

13  Panasonic also participated in the information exchanges that had the effect of limiting price

14  competition.  These agreements or information exchanges were conducted by sales managers,

15  account managers, or global account managers who typically reported to sales executives within

16  their respective companies.  For many of these companies over the course of the Conspiracy

17  Period, six or more people were directly involved in collusive activity.  The total number of

18  collusive communications associated with bid-rigging or information exchanges during the

19  Conspiracy Period was in the hundreds.

20      138.   OEMs sponsored meetings for all suppliers.  At such meetings, representatives of

21  Defendants and their co-conspirators would congregate at lunches and exchange contact

22  information for purposes of setting up future communications to discuss bid-rigging, as described

23  below.

24      139.   The representatives of the foregoing Defendants and their co-conspirators

25  communicated on the subject of their bid-rigging efforts in several ways.  Sometimes they

26  communicated by cellular telephone, either before the bidding process commenced or, in e-

27  auctions, while the live bidding process was ongoing.  Sometimes they exchanged information

28  through e-mails.  During some procurement events, they conducted face-to-face meetings at

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1  venues including a coffee shop in Austin, Texas, restaurants in Houston, Texas, and the lobby of

2  one defendant's office in Singapore.

3      140.    Defendants' and their co-conspirators' bid-rigging efforts started in 2004 and

4  continued at least into 2009 and affected prices paid for ODDs by Circuit City.  As noted below,

5  prior to 2004, prices for ODDs had been declining, but in that year, they stabilized, which

6  stabilization continued during the remainder of the Conspiracy Period.  Representative examples

7  of Defendants' and their co-conspirators' bid-rigging include the following:

8      141.    HP conducted a procurement event on behalf of its Business PC division that

9  involved an auction for the supply of ODDs ending on August 31, 2006.  Account managers from

10  a defendant and HLDS discussed the position each company wanted in the tiers of successful

11  bidders and agreed not to bid below $14.65 per unit, an agreement that they followed through on.

12      142.    In February 2009, HP instituted an auction for the supply of ODDs to its Business

13  PC and Consumer PC divisions.  The auction closed on February 19, 2009.  Account managers for

14  PLDS, TSST and another defendant discussed the rigging of this bidding process.  PLDS and

15  another defendant agreed that the former would not compete against the latter for the first tier

16  position among successful bidders.  PLDS and TSST then agreed that the latter would take the

17  second tier position, while the former would take the third tier position.  During the course of this

18  discussion, each agreed that they would not bid lower than their respective previous closing prices.

19  The final bids by each defendant reflected these various agreements.

20      143.    Dell conducted an auction for the supply of ODDs that closed on December 1,

21  2008.  Quanta (operating in conjunction with Sony Optiarc), PLDS, TSST, and HLDS submitted

22  bids.  Quanta's account manager spoke with one defendant's global account manager, who agreed

23  to seek a fourth tier position behind Sony Optiarc; the bidding reflected this agreement.  After Dell

24  asked for lower bids, Quanta and this defendant lowered their bids their bids by the same amount.

25      144.    Defendants and their co-conspirators engaged in additional acts of anticompetitive

26  conduct in furtherance of their conspiracy.  For example, in the latter part of 2004, after a period

27  of decline, quotations by Defendants and their co-conspirators to OEMs for 16x DVD-R players

28

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1    stabilized for a period of months.  By September 2004, Taiwanese ODD manufacturers were

2    claiming that the prices of such burners would remain stable for the remainder of the year.

3         145.    In March 2005, Danny Liao, President of Lite-On, said at a press conference that he

4    expected any price competition for the global market of ODDs to slacken in 2005 because

5    Japanese manufacturers had forced out most of Taiwan's second tier manufacturers and almost all

6    of China's manufacturers.

7         146.    In May 2007, Sony NEC introduced its first BD-R player, the BD-M100A.

8    According to Digitimes, sources from Taiwan-based manufacturers of ODDs said that since Sony

9    NEC was a member of the BDA, its pricing would be a reference for other members who

10   manufactured such an ODD, including Philips, LG and Samsung.

11        147.    Beginning in February 2008, prices on many ODDs that played BDs began to

12   climb.  In August 2008, personal computer vendors, including HP, Dell, Circuit City and Asustek

13   Computer, sought reductions in OEM and Original Design Manufacturer ("ODM") prices of BD

14   Combo and BD-ROM drives.  However, leading manufacturers, such as Pioneer, Lite-On, HLDS

15   and TSST, were all steadfast in refusing to lower their prices.  Andy Parsons, Chairman of the

16   BDA and a Senior Vice-President of Pioneer, said in October 2008 that the prices for BD players

17   would not be coming down soon.  In a competitive market, at least one or more of Defendants and

18   their co-conspirators would have broken ranks to capture market share.

19        148.    As noted above, throughout the Conspiracy Period, Defendants routinely

20   communicated with each other to share confidential business information about ODDs, including

21   information about customers, specific products, pricing, and production.  Defendants, their co-

22   conspirators, and their respective employees were aware that such communications were

23   inappropriate and took steps to conceal their communications by using cellular phones or meeting

24   in person to ensure, to the extent possible, that communications were not in writing and that no

25   evidence of such communications was left behind.  These communications numbered at least in

26   the hundreds.

27        149.    As discussed above, Defendants and their co-conspirators created joint ventures or

28   other cooperation arrangements that functioned as means to fix prices for competitive products

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1   manufactured or sold by the joint venturers.  For example, the joint ventures operated by HLDS,

2   PLDS, Sony Optiarc, and TSST provided a structure for collusion in furtherance of the conspiracy

3   alleged herein.

4         150.    Upon information and belief, and based upon review of the pleadings in the *In re*

5   *Optical Disk Drive Products Antitrust Litigation*, Master File No. 3:10-md-02143 consolidated

6   litigation, to date, certain Defendants and their co-conspirators have already produced more than 4

7   million documents that contain information regarding Defendants' and their co-conspirators'

8   confidential information exchanges and agreements.

9         151.    The patent pools described previously also facilitated the operations of the price-

10   fixing conspiracy by restricting competition among pool members.  For example, on information

11   and belief, licensees from the 3C DVD Patent Pool and DVD 6C Patent Pool were required to

12   report customer, sales and pricing data to pool members, ensuring that Defendants and their co-

13   conspirators had access to sensitive non-public commercial information that facilitated the

14   conspiracy.  The license agreement for the DVD 6C Patent Pool specifically required the patent

15   licensee to agree that such information could be shared among the members of the licensing group.

16        152.    Defendants' and their co-conspirators' exchanges of competitively sensitive

17   information were directed by customer account managers and sales directors, who exchanged

18   personal cell phone numbers and email addresses with their rival ODD suppliers to facilitate the

19   conspiracy.  Before switching jobs, these employees would introduce their replacements to their

20   contacts at rival ODD suppliers.

21        153.    A May 2006 e-mail from Eugene Yang of HLDS to Daniel Hur of HLDS requested

22   competitors' contact information.  In response, Hur acknowledged the illegal nature of the

23   competitor contacts, explained to Yang that he should meet his competitors at "a place where it

24   would be very unlikely for people to see you," and suggested using Starbucks, but cautioned "that

25   does not meet [*sic*] those places are guaranteed to be safe."

26        154.    In October 2007, Hyun Chul Son reported to a number of HLDS employees,

27   including Hur: "I've checked it through Freddie, SNO's DVD-ROM isn't supported from Lite-on.

28   This model is produced by Foxconn as OEM and supply to SNO."  On information and belief, the

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

"Freddie" referred to by Son is Freddie Hsieh of Lite-On/PLDS, and SNO refers to Sony NEC Optiarc.

155.    In February 2009, an HLDS employee acknowledged that competitor contacts were improper given government investigations in other industries and counseled employees to keep these contacts out of documents or emails:

> Recently in the USA & EU, investigations on collusion between suppliers are being strengthened.  LG TV & LGD are under the investigation as a close example.  I guess other industries also know this thru news or something.  With competitor, especially T company, we need to be extremely careful about contacts, and let's be careful so that there are not should in documents / email. (since the share of T and us combined becomes more than 50%, there is a chance that the issue will grow even bigger).

On information and belief, the "T company" and "T" referred to in the above e-mail is TSST.

156.    In March 2009, Daniel Hur of HLDS emailed Eugene Yang of LG, among others, encouraging his colleagues to conceal their competitive contacts:

> To avoid unnecessary misunderstanding for industry information-gathering purposes, we should purchase and use an outgoing call-only phone instead of using our business cell phones.

157.    In an email sent on or around April 14, 2009, Yang of LG informed Hur of HLDS and others that "The Houston office has purchased a Prepaid Phone for security purposes. We . . . will use pre paid phones also for confidential conversations in the future."

158.    In October 2008, Caroline Lin of Quanta emailed other Quanta employees regarding an "RFQ Discussio [sic] with Amino-san."  On information and belief, the email subject referred to Amino Masafumi from Sony Optiarc.  Quanta and Sony Optiarc were to act as partners in an upcoming ODD procurement event.  Lin reported: "I'll have dinner w/HLDS Eugene [Yang, on information and belief] this Friday evening and get the consensus on the price protection."

159.    The following Monday, Lin reported to her colleagues at Quanta, Sally Huang and Haw Chen:  "Last week, I met HLDS guy. According to what he said, their best price is around

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1   24.65 eventually. However, the [sic] they won't go that far in the 1st round as well and might

2   provide a higher price to see [the customer]'s feedback & then react."

3        160.    In July 2005, Hank Hayami of NEC emailed other NEC employees, including

4   Glenn Brower, and stated that "when our [NEC's] top management met TSST top management

5   last week, TSST clearly mentioned as below. . . ."  The information was received by Kris

6   Williams of NEC, who stated that he had "a good contact at Toshiba, and I will contact him

7   tomorrow.  I will also provide the yield rate at Sharp factory and TSST (Samsung) drive factory

8   on the new lead-free slim 8X DVDRW."

9        161.    In October 2007, Kris Williams of Sony NEC Optiarc emailed Vincent Chng of

10  Sony NEC Optiarc, advising him that "[t]he only other piece you need to round out your job

11  responsibilities, is the data gathering piece from other suppliers.  I think that you can be more bold

12  with Tokyo if you have good info on competitors."  Later in the email chain, Chng requested

13  contact from Williams' contact at HLDS.  Williams responded, "Jason should contact you soon

14  . . . . I will also try to put you in contact with Matt from TSST. . . . I will give you contact info for

15  him."  On information and belief, Jason refers to Jason Kim from HLDS and Matt refers to

16  Matthew Lee at TSST.

17       162.    In July 2007, Williams compiled information about slim PATA tray-loaded DVD-

18  RW drives.  TEAC confirmed that it was paying $1.91 for one of the component parts of the drive.

19       163.    As early as November 2003, Yasuki Hiraoka, Team Leader at HLDS, and an

20  HLDS employee with the last name Nagasawa had dinner with sales personnel from Pioneer.   In

21  an internal HLDS document, the HLDS employees reported to their colleagues that Pioneer had

22  provided HLDS with highly sensitive  business information, including: (1) target dates for

23  delivery of new products to Apple such as the 8x dual ODD; (2) pricing on the Apple account for

24  both 4x and 8x drives; (3) the disclosure that Pioneer was facing production capacity restraints for

25  its DVD-W slim drive; (4) that Pioneer would not be ready to launch its dual layer drive in the

26  second quarter of 2004 as it had previously announced; and (5) Pioneer's intention to stop its

27  production of DVD-ROM drives and to instead purchase the drives from a Taiwanese third party.

28

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

164.     In February 2005, Panasonic and Pioneer both submitted bids to HP for the supply of ODDs in April and May 2005.  Faced with a sharp demand by HP to lower its costs, Panasonic employee Yoshihiro Takada contacted his known competitor on the account, Pioneer, to ascertain Pioneer's price and bidding strategy: "I contacted Pioneer the other day; they finished their evaluation last Wednesday and are bidding $73/April while it hasn't been decided who to use." Armed with this information, Panasonic refused to lower its price to HP's requested $69 for May 2005, and instead suggested that it would bid only $71.  In an email two days later, Panasonic employee Tosio Nakayama instructed his colleagues to "reinvestigate/ascertain whether Pioneer can actually keep up with the May price, and get back to me without delay" before Panasonic would commit to the $71 price HP requested for the May supply of ODDs.  Based on the "results of the investigation," only then would Panasonic respond with a price to HP.

165.     In an internal email sent in May 2005, Tina Phan, Panasonic Senior Account Manager for Apple, updated colleagues on Pioneer's qualification status at Apple and speculated on Panasonic's chances competing for Apple's business:

> My understanding is Pioneer is very aggressive on pricing as they are not competing well on the engineering side. For CQ4, it'll be a challenge as 2nd source and potentially 3rd source across the board.

166.     In a later email, Phan reported on the exact prices that competitors, including Pioneer, planned to quote Apple: "After our conference call yesterday, I checked on our competitors pricings: I. Pioneer's SD process - CQ2 firm quote: $76.50 - Conditional offer of $73 for June if qualified for Q45CIand Q88- CQ3 price: 72.50."  Based on this information, Phan concluded that Panasonic's price was "quite competitive."

167.     In September 2005, Jonae Wilson, a Global Account Manager at Pioneer Electronics (USA) Inc. emailed Billy Reynolds of PLDS and asked whether PLDS had "received the official award of business for BD" from Dell.  In the same email, Wilson thanked Reynolds for his time the previous week, thus confirming that they had directly met.  When Reynolds explained that PLDS hadn't received the official award, Wilson explained that Pioneer was "going to chat with Dell about the 2nd source opportunities, but didn't want to do so until all was official for [Philips]."  Eventually Reynolds confirmed that PLDS had received the award.  The implication of

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1  this question was that Pioneer did not want to approach Dell to negotiate the provision of ODDs

2  until the contract with PLDS was final, in order to prevent any price competition over the supply

3  of ODDs for that time period.

4        168.    In May 2006, Yasuki Hiraoka of HLDS reported to his colleagues that he wanted to

5  postpone HLDS's price quotation to customer Fujitsu until HLDS could "get more underground

6  info." Hiraoka then went on to report his meetings with Pioneer and Panasonic. Regarding

7  Pioneer, Hiraoka reported that he "had dinner with Pioneer yesterday." Regarding the Dell

8  account, Pioneer told HLDS that it had not promised Dell a rebate on the Slim-DVD-W product.

9  Pioneer disclosed to its competitors, HLDS, that it intended to visit the Dell Austin office the

10  following week, but would not be prepared to discuss rebates with Dell. Hiraoka reported that

11  Pioneer had "not setup any plan for support like we do for our product."

12        169.    In November 2006, Yasuki Hiraoka of HLDS reported to his colleagues that he had

13  met with competitors MEI (Panasonic) and TSST the previous night, gave an extensive report, and

14  stated: "I have a [sic] appointment with Pioneer tonight so I will get updates on their activity

15  directly." The following day, after his meeting with Pioneer, Hiraoka reported that Pioneer had

16  disclosed that it had no plan to launch the 12.7 mm and 9.5 mm slot product to date, given that

17  there was base demand only from Apple. Pioneer confirmed it was in a "[s]erious situation" for

18  slim SM drives and scared of losing business in this area. Hiraoka informed Pioneer that "TSST

19  will start to deliver from Q1/07 so [the price] will be up to them."

20        170.    In February 2007, Jun Okubo of Panasonic met with General Department Manager

21  Shinichi Nojiri, Department Manager Kenichi Nakamura and Section Chief Hiro Sugawara of

22  Pioneer to discuss the Apple account. Among the competitive information exchanged was:

23  (1) Pioneer's capacity for 12.7 mm SD supply to Apple for March (around 9000 units) and that

24  Pioneer could not increase this amount for Apple; (2) the price estimate from Pioneer for the

25  supply of the 12.7 mm drives was "the same as the information from the other day - they haven't

26  reduced it at all"; and (3) Pioneer didn't "have any new products this whole year (the current

27  model is the one from last spring), so they have no ability to reduce the price further." Panasonic

28  concluded from this last piece of information that it should not reduce its price either.

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

171.    An internal Panasonic email produced in the consolidated multidistrict litigation reveals that in March 2007, Yoshi Takada provided a further report to his colleagues regarding the HP account and the consensus of the various Panasonic entities to reach agreement on a bidding strategy for the HP account.  Takada reported that Panasonic Shikoku Electronics Co., Ltd. ("PSEC") had directly communicated with Pioneer to confirm its pricing in the coming months:

> After I finished writing this e-mail, I saw Amy's update information.  It seems that we need to change 2nd round strategy to go around $31.60.  Only one thing I confirmed from PSEC (directly talked with Pioneer) is they quote really agressive [sic] price in Apr-May, but will slow down in June and based on June price, they will consider strategic price again in July.

172.    Takada instructed his colleagues to "collect more information" from Panasonic's competitors, including Pioneer, before deciding on their second round bidding price.  Later that month, Takada reported on his investigation and communication with competitors regarding pricing strategy and getting "behind-the-scenes information on second round bids."  Specifically, he reported Pioneer's first round results, among others, and stated that, "according to HLDS, Pioneer has made a definite statement that they'll handle all their Q2 prices aggressively," showing that Pioneer communicated with competitors about pricing strategy in between rounds of a procurement event.

173.    In June 2007, Bruce Jeong of HLDS reported extensive and detailed competitive "information from a discussion with the Japanese ODD company in Taiwan."  An employee of the "P company" (*i.e.*, Pioneer) shared with Jeong slim drive quality issues and future bidding strategies, as well as production line and manufacturing information for Slim Slot products and small quantities of HH DVD-RW and HH BD products.  Jeong also related information he learned from Pioneer about its transactions with customers, its forecast of PC sales to Apple, and competitive information sharing with HP.

174.    Pioneer employees met with competitors to share nonpublic information.  For example, in September 2007, Shinichi Yamamura of Sony emailed a colleague that he went drinking with Pioneer employees, including Toshihiko Kurihara, General Manager of the

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

Components Business Division.  In May 2008, Katsuhiro Nakano of Sony and Shinichi Nojiri of Pioneer arranged to meet for meal, assuring each other that senior managers on both sides would be in attendance: Toshihiko Kurihara of Pioneer and Shinichi Yamamura (Representative Director and President of Sony NEC Optiarc), Hidetoshi Shimizu (General Manager of Sales at Sony NEC Optiarc), and/or Yasuro Katori (Senior General Manager, Strategic Planning Division, Sony NEC Optiarc).

175.    In October 2008, Kenny Lee, Senior Manager of TSST, reported the results from a 12.7 DVDR HP procurement event to his colleagues.  Lee stated that the competitors, including Pioneer, reached an agreement not to "overheat each other" in auction, leading to a favorable result:  "Result: 1st place $24.40, TSST M/S 36% 2nd place HLDS, 3rd Quanta, 4th Pioneer because initially the atmosphere was do not overheat each other, there is no actual difference between 2nd and 3rd place in price 24.2~24.4 but fortunately we can get the 1st place supply by small price difference."

176.    The supply of OPUs, a component of ODDs, also became a channel for the exchange of sensitive business information.  For example, in January 2009, PAVC, a division of Panasonic that supplied OPUs to other ODD manufacturers, informed HLDS that Pioneer had started to deliver Slim BD-W drives to Sony.   Panasonic's inside information regarding Pioneer (and subsequent report to HLDS) was based on Pioneer's purchase of OPUs from PAVC at the rate of 10,000 per month.  Yasuki Hiraoka of HLDS reported this information to his colleagues and expressed his concern that because Pioneer was in a "severe situation," they could start "dumping" product.  Hiraoka's colleague at HLDS, Bruce Jeong, reported back that he "checked with Pioneer and that Pioneer had qualified on the BD-W model, but was supplying very little product," negating any pricing threat.

177.    Pioneer's dual role as an ODD manufacturer and a customer of other ODD manufacturers opened channels for illegal and anticompetitive communications.  Internal PLDS documents produced in the consolidated multidistrict litigation show that in late 2008, a number of PLDS employees including Claire Lin and Charlie Tseng met with Ken Usui, a sales manager at Pioneer, regarding the possible supply of ODD drives from PLDS to Pioneer.  After the meeting,

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1  Lin emailed Usui expressing PLDS's gratitude for arranging the meeting and for "share [sic] so

2  many market information with" PLDS.  In early 2009, PLDS approached Pioneer as a supplier of

3  a particular type of ODD drive.  Pioneer declined to use PLDS as a supplier at that time, but Usui

4  responded to Lin: "Let's keep in touch with market trend and I am willing to share the market

5  information."  Within days, Lin responded that Charlie Tseng of PLDS wanted to speak with Usui

6  regarding the supply of a particular type of drive and "to exchange the market trend again."

7         178.    Other internal PLDS documents show that in March 2009, Lin provided to Tseng

8  an "Update of Pioneer" that included information from Usui about the allocation of OPUs and

9  information regarding Pioneer's production and outsourcing of certain ODD drives:

10        3) ODD

11        Pioneer Taiwan commented that almost no OPU shortage impact of H/H

12        DVDROM w/Q but Usui san said they tried really hard to secure the allocation.

13        Pioneer Taiwan told us that out-sourcing 22X will launch in May since Pioneer's

14        own factory made H/H DVDRW will stop production in May.  As for 24X, no

15        further information.  Has asked for Procurement team's help to check.

16  **E.      Governmental Antitrust Investigations of the ODD Industry**

17        179.    In October 2009, it was reported that the United States Department of Justice

18  ("DOJ") had commenced an investigation into anticompetitive conduct in the ODD industry and

19  had served subpoenas on Sony Optiarc America, HLDS, and TSST.  Around the same time, at

20  least one Defendant acknowledged that foreign antitrust enforcement agencies were also

21  investigating the ODD industry.

22        180.    Beginning in 2009, certain ODD manufacturers including HLDS, Sony, and Philips

23  disclosed in SEC filings that they had received DOJ subpoenas related to an ODD antitrust

24  investigation or were a target of the investigation.  Sony has acknowledged that it believes the

25  request for information from the DOJ is part of a wider review of anticompetitive conduct in the

26  ODD market by the DOJ and competition authorities in other countries.

27        181.    On or around October 26, 2009, news sources reported that other companies,

28  including Toshiba, Hitachi, Samsung and LG, had received DOJ subpoenas.  On or around

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1  October 27, 2009, Hitachi and Toshiba confirmed that, like Sony, their ODD operations in the

2  United States had received a DOJ subpoena in a widening investigation into potential antitrust

3  violations.  They also acknowledged that they were under investigation by European Union and

4  Singaporean antitrust regulators.

5  182.   It is significant that Defendants' anticompetitive behavior has been the subject of a

6  criminal grand jury investigation by the DOJ.  In order to institute a grand jury investigation, a

7  DOJ Antitrust Division attorney must believe that a crime has been committed and prepare a

8  detailed memorandum to that effect.  *See* Antitrust Grand Jury Practice Manual, Vol. 1, Ch. I.B.1

9  ("[i]f a Division attorney believes that a criminal violation of the antitrust laws has occurred, he

10  should prepare a memorandum requesting authority to conduct a grand jury investigation.").  The

11  request for a grand jury must be approved by the Assistant Attorney General for the Antitrust

12  Division based upon the belief that a criminal violation may have occurred.  *See id.*  The fact that

13  the DOJ Antitrust Division investigation is criminal, as opposed to civil, is also significant.  The

14  Antitrust Division's "Standards for Determining Whether to Proceed by Civil or Criminal

15  Investigation" state: "[i]n general current Division policy is to proceed by criminal investigation

16  and prosecution in cases involving horizontal, per se unlawful agreements such as price fixing, bid

17  rigging and horizontal customer and territorial allocations."  Antitrust Division Manual, Chapter

18  III.C.5. Accordingly, the existence of a criminal investigation into the ODD industry supports the

19  existence of the conspiracy alleged herein.

20  183.   The DOJ confirmed its activities in a motion to stay proceedings in the main MDL

21  case filed on May 20, 2010, stating that "[t]he DOJ is currently investigating possible criminal

22  violations in the optical disk drive (`ODD') industry."  *See* Memorandum of Points and

23  Authorities In Support Of the United States' Motion For A Limited Stay of Discovery at 15 (May

24  20, 2010) (Dkt. No. 68).  In support of that motion, the DOJ submitted under seal a declaration

25  regarding the status of its investigation.

26  184.   The DOJ's investigation has already yielded a guilty plea from HLDSI and four

27  executives.  In November 2011, HLDSI pled guilty to conspiring to fix prices and rig bids for

28  ODDs and agreed to pay a $21.1 million criminal fine.  HLDSI admitted that its officers and

COMPLAINT
MDL No. 10-2143

employees engaged in discussions and meetings with representatives of other major sellers of ODDs and reached agreements to fix prices of ODDs and to rig ODD negotiations.

185.   Additionally, the following HLDSI executives individually pled guilty to participating in the conspiracy: Young Keun Park, Sang Hun Kim, Woo Jin Yang, and Sik Hur. Each of the executives was ordered to pay a $25,000 fine and also received a jail sentence.

**F.   Economic Data on Pricing and Supply**

186.   During the Conspiracy Period, ODD pricing did not behave as would be expected in a competitive market.  After introduction into a market, consumer electronics products and their component parts are typically characterized by downward pricing trends.  However, the ODD market has been characterized by unnatural price stability and certain periods of upward pricing trends.

187.   The cost of manufacturing ODDs should have declined as manufacturing bases shifted to lower-cost countries.  In a competitive market this would be reflected in downward pricing trends as well.  Instead, prices for computer storage devices, including ODDs, leveled off during the Conspiracy Period, as shown in the chart below.



**Producer Price Index for Computer Storage Device Manufacturing**
**Jan. 1999-May 2009**

Source: U.S. Bureau of Labor Statistics
Producer Price Index for Exports 334112334112: Computer Storage Device Manufacturing
Note: Includes devices that allow the storage and retrieval of data from a phase change, magnetic, optical, or magnetic/optical media.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

188.    If they had acted competitively, ODD makers would have had different incentives depending on the size of their market share in an existing generation of optical disc technology. Because of these different incentives, stable prices cannot be explained merely as conscious parallelism.  The fact that Defendants and their co-conspirators uniformly held off on significant price reductions regardless of share indicates that they were acting conspiratorially.

189.    Changes in demand for ODDs are also unlikely to explain the unnatural price stabilization during the Conspiracy Period.   For example, ODD prices remained relatively stable between 2004 and 2006, despite a drop in sales of DVD players, as reflected in the following chart obtained from the website of DEG.

| U.S. DVD HARDWARE SALES TO CONSUMERS (in millions) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| QUARTER | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
| 1st Quarter | .030 | .094 | .358 | 1.350 | 2.220 | 3.565 | 4.858 | 6.855 | 7.741 | 7.852 | 8.350 | 6.01 |
| 2nd Quarter | .079 | .149 | .611 | 1.435 | 2.404 | 3.750 | 5.506 | 6.057 | 6.006 | 6.676 | 6.396 | 4.98 |
| 3rd Quarter | .077 | .244 | .880 | 1.550 | 2.537 | 4.740 | 6.470 | 6.593 | 6.250 | 6.831 | 6.139 | 5.39 |
| 4th Quarter | .119 | .459 | 1.701 | 5.542 | 9.501 | 13.058 | 16.900 | 17.621 | 14.343 | 12.512 | 12.633 | 8.85 |
| YEARLY TOTAL | .305 | .946 | 3.550 | 9.877 | 16.662 | 25.113 | 33.734 | 37.125 | 34.390 | 33.871 | 33.518 | 25.23 |
| TOTAL (since launch) | | | | | | | | | | | | 264.262 |

Includes set-top and portable DVD players, Home-Theater-in-a-Box systems, TV/DVD and DVD/VCR combination players
DEG: The Digital Entertainment Group

190.    Additionally, during the Conspiracy Period, the cost of ODD primary components continued to decline, yet prices did not follow.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

COMPLAINT
MDL No. 10-2143



KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

191.    As one news report issued at the time of the announcement of the DOJ's investigation of Sony's ODD subsidiary observed:

> Analysts have been wondering why Blu-ray prices have remained high even though the technology has been commercially available for over three years. HD-DVD has been gone for nearly two-thirds of that time and one would have expected costs to have declined by now. The fact that they haven't is causing some to question whether or not Sony is doing something to keep the prices up.

192.    Defendants' and their co-conspirators' use of "Minimum Advertised Price" ("MAP") policies with respect to retail pricing of their ODDs in the United States also facilitated the conspiracy by ensuring that retail pricing did not undercut the price-fixing agreements Defendants and their co-conspirators had reached. For example, Samsung's MAP policy applicable to BD players, among other products, barred retailers from promoting prices that violated the MAP "online or offline" through any publication. Repeated violations of Samsung's MAP policy would result in termination. Sony and Toshiba, among others, also have MAP policies.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

### G.    Defendants' History of Collusion in Other Markets

193.    Many of Defendants and their co-conspirators have been implicated in antitrust investigations into other technology-related products and/or have admitted to participating in anticompetitive cartels involving other products.  To the extent that these prior instances of conspiratorial conduct involved consumer electronics products, the products in question were marketed through the same or related channels used for the marketing of ODDs and were overseen by the same divisions or departments within the relevant defendant or co-conspirator for at least a portion of the Conspiracy Period.

194.    <u>Televisions</u>:  In February 1993, the Japan Fair Trade Commission ("JFTC") entered a cease-and-desist order against subsidiaries of Sony, Toshiba, Hitachi and what is now Panasonic, finding that the subsidiaries had requested that large discount stores in Tokyo and Osaka not display discount rates larger than 10 percent of the maker's recommended retail prices for products including televisions.  The JFTC noted that similar practices had occurred in 1988 when it instructed two major industry associations, including the Japan Electronics Industry Association, to stop them, but the practices had continued.

195.    <u>Magnetic Videotapes</u>:  In November 2007, the European Commission ("EC") fined Sony and various related entities and the Hitachi Maxell Ltd. joint venture $110 million for fixing the prices of professional videotapes sold in Europe between 1999 and 2002.

196.    <u>Optical Disc Licensing Policies</u>:  In July 1994, the DOJ announced it was investigating the licensing practices of several leading companies that owned and licensed CD manufacturing patents, believed to include Sony and Royal Philips.  It was reported that the two companies had signed a "pact" in the late 1970s agreeing to "cross-license each other's basic patents on CD technology" and collect fees from vendors.  It was further reported that the DOJ had issued subpoenas to several companies dealing with Royal Philips and Sony, including DiscoVision Associates, a subsidiary of Pioneer.

197.    In August 2006, the EC initiated an investigation regarding the procedures required in order to obtain a license for BD and HD-DVD standards.

COMPLAINT
MDL No. 10-2143

198.     As noted previously, in October 2008, it was announced that two of the major players in the ODD market, Sony and Royal Philips, had been fined by the TFTC for their abuse of monopoly power in the licensing of CD-R technology.

199.     <u>Gas Insulated Switchgears</u>:  In January 2007, Hitachi and Toshiba were fined by the EC for their roles in a conspiracy to control prices and allocate market shares for gas insulated switchgears between 1988 and 2004.

200.     <u>DRAM</u>:  In October 2005, Samsung admitted guilt and paid a $300 million fine following an investigation by the DOJ into price-fixing among DRAM manufacturers.

201.     On May 19, 2010, the EC announced that it was fining ten companies – including Samsung, NEC, Hitachi, and Toshiba – a total of €331 million for participating in an international cartel to fix DRAM prices.

202.     <u>SRAM</u>:  Samsung and Toshiba have acknowledged being contacted by the DOJ as part of an investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

203.     <u>CRTs</u>:  In a cease-and-desist order dated October 7, 2009, the JFTC levied $37.4 million in fines against five companies for alleged participation in a price-fixing cartel for CRTs, including LG Philips Displays Korea Co. and an arm of South Korea's Samsung group.

204.     On November 26, 2009, the EC confirmed that it had sent a Statement of Objections to participants in the CRT cartel in Europe.  It has been reported that "[t]he EC believes that Chunghwa Picture Tube (a unit of Tatung), LG Electronics, Matsushita (Panasonic), Philips, Samsung and Toshiba have formed cartels to boost pricing of CRT-based devices, such as computer monitors or TV-sets."

205.     Korea's Fair Trade Commission fined more than five manufacturers of CRTs over $48 million.  The EC imposed the biggest antitrust penalty in its history, fining seven companies a combined €1.47 billion ($1.92 billion) related to price fixing of CRTs.

206.     In November 2007, Hitachi Canada Ltd., a subsidiary of Hitachi, received requests for information from the Canadian Competition Bureau with respect to alleged antitrust violations relating to CRTs.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

207.    Since February 10, 2009, the DOJ has issued six indictments against individuals in connection with the CRT price-fixing conspiracy.  In May 2011, Samsung SDI Company Ltd. ("SDI"), a Samsung subsidiary, agreed to pay a $32 million criminal fine and pled guilty to charges brought under the Sherman Act.  Specifically, SDI admitted to participating in a conspiracy among major CRT producers, the primary purpose of which was to fix prices, reduce output, and allocate market shares of CRTs sold in the United States and elsewhere.

208.    TFT-LCDs:  In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the TFT-LCD market.  News reports indicated that Samsung, Toshiba, LG, Hitachi, and a joint venture between Philips and LG Electronics-LG Display Co., Ltd. were all under investigation for price fixing TFT-LCDs.

209.    In December 2008, the DOJ announced that: (a) LG Display, a joint venture between LG and Royal Philips, pled guilty to antitrust price-fixing allegations with respect to TFT-LCDs and agreed to pay a $400 million fine and (b) Sharp pled guilty to bid-rigging with respect to certain customers of TFT-LCDs and agreed to pay a fine of $120 million.

210.    On March 10, 2009, the DOJ announced that Hitachi Displays, a subsidiary of Hitachi, Ltd., had agreed to plead guilty to violations of the Sherman Act and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD products.  In its plea agreement, Hitachi Displays admitted to agreeing to fix the prices of LCD panels.

211.    In December 2008, the JFTC fined Sharp and Hitachi with respect to a conspiracy involving TFT-LCDs sold for use in Nintendo game consoles.

212.    It is widely believed that Defendant SECL is in the DOJ's leniency program with respect to the investigation into the market for TFT-LCDs, meaning that it has admitted its participation in the cartel.  The TFT-LCD investigation is ongoing, and Toshiba and other entities remain under investigation.

213.    In July 2009, the EC confirmed that it had sent a Statement of Objections to participants in the TFT-LCD cartel in Europe.

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

214.  <u>Similarities with ODDs</u>:  As in the TFT-LCD industry, many of Defendants are vertically integrated major manufacturers of products containing ODDs.  For example, the LG and Samsung entities manufactured and sold both TFT-LCD panels as well as TFT-LCD computer monitors and flat panel televisions.  Similarly, Samsung, Toshiba, and Sony manufacture and sell both ODDs and computers containing ODDs.  Additionally, the ODD market has a structure similar to that of the TFT-LCD, DRAM and CRT industries.  Defendants' price-fixing agreements in those markets is suggestive of similar anticompetitive conduct in the ODD market.

215.  The established illegal conduct of Sony, Samsung, Sharp, Panasonic, Hitachi, LG, and Royal Philips in a wide variety of technology products markets across the world, including the United States, is illustrative of Defendants' and their co-conspirators' respective corporate cultures which encourage illegal activities aimed at furthering the company's bottom line at the expense of consumers.

216.  In November 2007, Kim Yong Chul, the former chief lawyer for Samsung, admitted that the company "instructed me to commit crimes."  Chul further stated that "[a] basic responsibility for all Samsung executives is (sic) to do illegal lobbying, buying people with money."  Chul acknowledged that he had fabricated court evidence on behalf of the company and its executives.  Several Samsung executives have recently been convicted of bribery and other white collar crimes.

**H.  Injury to Circuit City Caused by the Conspiracy**

217.  A former leading retailer of consumer electronics, Circuit City purchased billions of dollars' worth of ODDs and products containing ODDs during the relevant period.  On information and belief, such goods included but were not limited to stand-alone and component ODDs, small and large tube televisions, LCD televisions, TV projectors, home theaters in-a-box, DVD players, HD-DVD players, camcorders, mobile video displays, home audio equipment and receivers, marine audio equipment, mini component systems, satellite radio accessories, portable DVD players, karaoke systems, CD players and "boomboxes," clock and table radios, notebook computers, desktop computers, and stationary and portable audio speakers.  These goods were purchased directly and/or indirectly from the Defendants and/or their subsidiaries.

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

218.   Based upon information currently available, Circuit City Trust is informed and believes that Circuit City's purchases of ODDs or ODD-containing goods during the relevant period: (1) from Toshiba-related entities totaled approximately two billion dollars ($2,000,000,000); (2) from Sony-related entities totaled approximately four billion six hundred million dollars ($4,600,000,000); (3) from Samsung-related entities totaled approximately two billion dollars ($2,000,000,000); and (4) from Philips and Lite-On related entities totaled approximately one billion dollars ($1,000,000,000).

219.   As a direct and proximate result of Defendants' and their co-conspirators' conspiracy, Circuit City Trust has been damaged in an amount in excess of $50 million, the exact amount of damages to be determined according to proof.

## I.   Fraudulent Concealment

220.   Prior to at least October 26, 2009, Circuit City did not discover, and could not have discovered through the exercise of reasonable diligence, sufficient facts to show the existence of the conspiracy alleged herein.

221.   The acts of Defendants and their co-conspirators in furtherance of the conspiracy were concealed and carried out in a manner that precluded detection.  Defendants and their co-conspirators concealed their unlawful conduct by (among other things):

- Agreeing not to discuss publicly or otherwise reveal their acts and communications in furtherance of the price-fixing conspiracy;

- Agreeing to limit the number of representatives of each Defendant or co-conspirator that were aware of the conspiracy;

- Agreeing to limit written communications relating to or in furtherance of the conspiracy;

- Agreeing to meet in locations where the conspiracy was less likely to be detected;

- Coordinating bidding and price negotiation covertly in order to avoid detection;

- Giving false and pre-textual reasons for ODD price stabilization and falsely describing the stabilization as the product of external causes and not collusion;

- Publicly announcing, falsely, that ODDs were competitively priced.

1   Indeed, by its very nature, Defendants' price-fixing conspiracy was inherently self-concealing. In

2   light of Defendants' concealment, a reasonable person under the circumstances would not have

3   been alerted to investigate the legitimacy of ODD prices before at least October 26, 2009.

4        222.    Additionally, Circuit City Trust's claims were tolled by the filing of various class

5   action lawsuits shortly after the conspiracy began to come to light in October 2009, by ongoing

6   government investigations, and by any other tolling available under applicable law.

7                        **FIRST CAUSE OF ACTION**

8                **(Violation of Section 1 of the Sherman Act)**

9        223.    Circuit City Trust re-alleges paragraphs 1 through 222 as if fully set forth herein.

10       224.    Beginning at a time presently unknown to Circuit City Trust, but no later than

11   January 1, 2004, Defendants and their co-conspirators entered into a continuing agreement,

12   understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or

13   stabilize prices for ODDs in the United States, in violation of section 1 of the Sherman Act, 15

14   U.S.C. § 1.

15       225.    In formulating and carrying out the alleged agreement, understanding, and

16   conspiracy, Defendants and their co-conspirators unlawfully restrained trade in the United States

17   and damaged the competitive process, including by engaging in the following anticompetitive

18   acts:

19          •     Participating in meetings and conversations to discuss the prices and supply of

20             ODDs;

21          •     Sharing these pricing and other discussions with other members of the ODD

22             industry to further the conspiracy;

23          •     Communicating in writing and orally to fix target prices, floor prices, and price

24             ranges for ODDs;

25          •     Agreeing to manipulate the prices for and supply of ODDs sold in the United States

26             in a manner that deprived ODD purchasers of free and open competition;

27          •     Issuing price announcements and price quotations in accordance with the

28             agreements reached;

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

- Selling ODDs to customers in the United States, including Circuit City, at noncompetitive prices;

- Exchanging competitively sensitive information, including customer information, in order to facilitate the conspiracy;

- Agreeing to maintain or lower production capacity; and

- Providing false statements to the public regarding prices for ODDs.

226. As a result of Defendants' and their co-conspirators' unlawful conduct, Circuit City was injured in its business and property in that it paid more for ODDs than it otherwise would have paid in the absence of the conspiracy.

## SECOND CAUSE OF ACTION

### (Violation of the Cartwright Act)

227. Circuit City Trust re-alleges paragraphs 1 through 226 as if fully set forth herein.

228. During the Conspiracy Period, Circuit City conducted a substantial volume of business in California. Specifically, Circuit City issued purchase orders and payments for ODDs from California and took possession of ODDs in California.

229. Defendants and their co-conspirators participated in the conspiracy through their offices and operations in California. Employees at Defendants' and their co-conspirators' locations in California participated in meetings and engaged in other communications in furtherance of the conspiracy. Defendants and their co-conspirators also provided confidential business information obtained through meetings with other Defendants and co-conspirators to employees in their California offices for use in fixing ODD prices. Defendants and their co-conspirators sold and/or shipped price-fixed ODDs into California.

230. Beginning at a time presently unknown to Circuit City Trust, but at least as early as January 1, 2004, and continuing thereafter until at least January 1, 2010, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professions Code section 16720. Defendants and their co-conspirators each acted in violation of section 16720 by agreeing and acting to fix, raise, stabilize and/or maintain prices of, and allocate markets

COMPLAINT
MDL No. 10-2143

for, ODDs at supra-competitive levels.  Defendants' and their co-conspirators' conduct substantially affected California commerce.

231.    The aforesaid violations of section 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, ODDs.

232.    For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including (i) fixing, maintaining, raising, and/or stabilizing the price of ODDs; (ii) allocating markets for ODDs amongst themselves; (iii) submitting rigged bids for the award and performance of certain ODD contracts; and (iv) allocating among themselves the production of ODDs.

233.    The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (i) price competition in the sale of ODDs has been restrained, suppressed and/or eliminated in California; (ii) prices for ODDs sold by Defendants, their co-conspirators, and others were fixed, raised, maintained and/or stabilized at artificially high, non-competitive levels in California; and (iii) purchasers of ODDs, including Circuit City, have been deprived of the benefit of free and open competition.

234.    As a direct and proximate result of the conduct of Defendants and their co-conspirators, Circuit City paid supra-competitive, artificially inflated prices for ODDs it purchased during the Conspiracy Period.

235.    Based on the foregoing, Circuit City Trust is entitled to treble damages and costs of suit, including reasonable attorneys' fees, pursuant to section 16750(a) of the California Business and Professions Code.

## THIRD CAUSE OF ACTION

**(Violation of California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

236.    Circuit City Trust re-alleges paragraphs 1 through 235 as if fully set forth herein.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

237.    Defendants engaged in unfair competition and/or unfair, unconscionable, deceptive, and/or fraudulent acts or practices in violation of California's consumer protection and unfair competition laws.

238.    By reason of the foregoing, Defendants and their co-conspirators have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professions Code section 17200, *et seq*.

239.    Beginning at a time presently unknown to Circuit City Trust, but at least as early as January 1, 2004, and continuing thereafter until at least January 1, 2010, Defendants committed acts of unfair competition by engaging in the acts and practices described above.

240.    The acts, omissions, misrepresentations, practices and non-disclosures of Defendants and their co-conspirators, as described above, constituted a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of section 17200, *et seq*., including but not limited to the violations of the Sherman Act and violations of the Cartwright Act set forth above.

241.    Defendants' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

242.    Defendants' acts or practices are fraudulent or deceptive within the meaning of section 17200, *et seq*.

243.    Defendants' acts or practices were unfair to California consumers within the meaning of section 17200, *et seq*.

244.    Defendants' conduct was carried out, effectuated, and perfected within California.

245.    By reason of the foregoing, Circuit City Trust is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits obtained by Defendants and their co-conspirators as result of the acts and practices described above.

## V.  PRAYER FOR RELIEF

WHEREFORE, Circuit City Trust requests:

COMPLAINT
MDL No. 10-2143

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

A.      That the unlawful agreement, conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be:

    i.      A restraint of trade or commerce in violation of section 1 of the Sherman Act, as alleged in the First Cause of Action;

    ii.      An unreasonable restraint of trade or commerce in violation of the Cartwright Act, as alleged in the Second Cause of Action; and

    iii.      Unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices, in violation of California Unfair Competition Law, Business and Professions Code section 17200, *et seq.*, as alleged in the Third Cause of Action.

B.      That Circuit City Trust recover treble its actual damages, as provided by applicable federal and state law, and that a judgment be entered in favor of the Circuit City Trust against Defendants, jointly and severally, in such amount;

C.      That Circuit City Trust obtain penalties, punitive or exemplary damages, and/or full consideration, where applicable law so permits;

D.      That Circuit City Trust recover damages and/or all other available monetary and equitable remedies available under California's unfair competition laws;

E.      That Circuit City Trust be awarded pre- and post-judgment interest at the highest rate for the largest term permitted by law or equity;

F.      That Circuit City Trust recover its costs and disbursements of suit, including reasonable attorneys' fees as provided by law; and

G.      That Circuit City Trust be awarded such other further relief as the Court may deem just and proper.

## VI.  JURY DEMAND

Pursuant to Federal Rules of Civil Procedure Rule 38(b), Circuit City Trust demands a trial by jury as to all issues so triable.

COMPLAINT
MDL No. 10-2143

DATED: July 13, 2015          Respectfully submitted,

                              KLEE, TUCHIN, BOGDANOFF & STERN LLP


                              /s/ Colleen M. Keating
                              Colleen M. Keating

                              *Attorneys for Plaintiff Alfred H. Siegel, as Trustee for the Circuit City Stores, Inc. Liquidating Trust*